# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLABISI BODUNDE, *individually and on behalf of all others similarly situated*, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALGREENS BOOTS ALLIANCE, INC.,<br><br>Defendant. | Case No. 1:24-cv-00985-JLT-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANT'S MOTION TO DISMISS<br><br>(ECF No. 54)<br><br>**OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is Defendant Walgreens Boots Alliance, Inc.'s ("Walgreens") motion to dismiss. The Court held a hearing on the matter on March 26, 2025. Matthew Girardi, Esq., appeared for Plaintiffs. Rick Shackelford, Esq., appeared for Walgreens. Having considered the moving papers and arguments by counsel, as well as the Court's file, the Court issues the following findings and recommendations recommending granting Walgreen's motion to dismiss.

## I.

## REGULATORY BACKGROUND

Acne treatments are "drug" products that are regulated by the U.S. Food and Drug Administration ("FDA"), pursuant to the Food, Drug, and Cosmetics Act ("FDCA"). (ECF No. 50, ¶ 58.) Additionally, over-the-counter ("OTC") drugs are regulated by the FDA and must be safe and effective. (Id. at ¶ 59.) OTC drugs are subject to federal current Good Manufacturing

Practices ("cGMP") regulations and the FDCA's state law analogues.  (Id. at ¶ 59.)[1]  The cGMP regulations require OTC drug products meet safety, quality, purity, identity, and strength standards.  (Id. at ¶¶ 59, 77, citing 21 U.S.C. § 351(a)(2)(B).)  The cGMPs

> establish minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess.

(Id. at ¶ 60, quoting 21 C.F.R. § 210.1(a).)  In other words, these regulations cover design, manufacture, and distribution of OTC drug products.  (Id. at ¶ 60.)  Moreover, cGMP regulations set minimum standards for organization and personnel; buildings and facilities; equipment; control of components and drug product containers and closures; production and process controls; packaging and label controls; holding and distribution; laboratory controls; records and reports; and returned and salvaged drug products.  (Id. at ¶ 61.)  So long as drugs are intended to be distributed in the United States, the FDA has "worldwide jurisdiction" to enforce cGMP regulations.  (Id.)

FDA regulations also include that drug product manufacturers have "written procedures" for production and process control designed to comply with cGMPs.  (Id. at ¶ 63, citing 21 C.F.R. § 211.100.)  A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity."  (Id. at ¶ 64, quoting 21 C.F.R. § 211.160.)  "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or

---

[1] For example, Plaintiffs note that the Illinois Food, Drug and Cosmetic Act expressly adopted the federal labeling requirements, including the definition of the term "adulterated."  (ECF No. 50, ¶ 73; see id. ¶ 74.)  Plaintiffs also cite 36 other similar state statutes.  (Id. at ¶ 78.)

1  drug product tested." (Id. at ¶ 65, quoting 21 C.F.R. § 211.194(a)(6).)

2      Should a drug not be manufactured in accordance with cGMPs, the drugs will be

3  considered "adulterated" or "misbranded" and may not be distributed or sold in the United

4  States. (Id. at ¶ 62, citing 21 U.S.C. §§ 331(a), 351(a)(2)(B).) States have enacted laws adopting

5  or substantially mirroring the federal standards. (Id. at ¶¶ 62, 78.)

6      An OTC drug monograph establishes conditions, such as active ingredients, uses

7  (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in

8  a given therapeutic category (e.g., sunscreen, antacid) is generally recognized as safe and

9  effective ("GRASE") for its intended use. (See id. at ¶¶ 81-83.) Plaintiffs note that "[a]ny

10  product which fails to conform to an applicable monograph after its effective date is liable to

11  regulatory action." (Id. at ¶ 82, quoting 21 C.F.R. § 330.10(b).) In other words, once a final

12  monograph goes into effect, it is illegal to sell a drug that no longer conforms to "each of the

13  conditions contained in this part [330.1] and in an applicable monograph[.]" (Id. at ¶ 83, quoting

14  21 C.F.R. § 330.1.) The "conditions contained in this part"—i.e., the conditions under which the

15  FDA designates an OTC drug as GRASE—include a requirement that "(a) [t]he product is

16  manufactured in compliance with current good manufacturing practices, as established by parts

17  210 and 211 of this chapter." (Id. quoting 21 C.F.R. § 330.1(a).) In turn, parts 210 and 211

18  describe the cGMPs described above. (Id. at ¶¶ 84-86.)

19                                    **II.**

20          **BENZENE, BENZOL PEROXIDE, AND BPO PRODUCT BACKGROUND**

21      Benzene is an elementary petrochemical and is a component of crude oil, gasoline, and

22  cigarette smoke. (ECF No. 50, ¶¶ 29, 38.) The U.S. Department of Health and Human Services

23  has determined that benzene causes cancer in humans. (Id. at ¶ 30.) The FDA lists benzene as a

24  "Class 1 solvent" that "should not be employed in the manufacture of drug substances,

25  excipients, and drug products because of [its] unacceptable toxicity." (Id. at ¶¶ 30, 38, 40.) In

26  particular, benzene is associated with blood cancers such as leukemia. (Id. at ¶ 30; see id. at

27  ¶¶ 29, 31.) Exposure to benzene can be through "inhalation, skin absorption, ingestion, skin

28  and/or eye contact." (Id. at ¶¶ 23, 39, 42-45.) Plaintiffs cite to a 2010 study that concluded that

there is probably no safe level of exposure to benzene.  (Id. at ¶ 41.)

Benzol peroxide ("BPO") is a drug that is widely used as a treatment for acne.  (Id. at ¶ 33.)  In 2010, the FDA issued a final rule to include BPO as a GRASE active ingredient in OTC topical drug products.  (Id. at ¶ 81, citing Classification of Benzoyl Peroxide as Safe and Effective and Revision of Labeling to Drug Facts Format; Topical Acne Drug Products for Over-The-Counter Human Use; Final Rule, 75 FR 9767-01, 2010 WL 723253 (F.R. Mar. 4, 2010).)  Plaintiffs allege that the BPO in products made and sold by Walgreens "degrades over time to directly form Benzene."  (Id. at ¶ 33.)  Essentially, Plaintiffs assert that BPO can "thermally decompose" into "benzene radicals" that can then produce benzene.  (Id. at ¶¶ 34, 91.)  The process can be accelerated by "exposure to elevated temperatures equivalent to hot bathrooms or the temperature of a hot car/truck/shipping container . . . ."  (Id. at ¶ 34.)  Plaintiffs take this to mean that "the creation of benzene in the [p]roducts is a natural and foreseeable result of the [p]roducts' distribution and handling . . . ."  (Id.)  Plaintiffs note that acne creams and gels are applied directly to the skin.  (Id. at ¶ 46.)  The use of BPO in other industries, such as the polymer industry, has been accompanied with "various methods" to reduce the degradation of BPO into benzene.  (Id. at ¶ 35.)

Valisure LLC ("Valisure") is an analytical laboratory and online pharmacy that tests "medications and healthcare products to ensure their safety, quality, and consistency."  (Id. at ¶ 47.)  Valisure is accredited by the International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238) and is registered with the Drug Enforcement Administration (License # RV0484814).  (Id.)  On March 5, 2024, Valisure filed a citizen petition with the FDA, requesting a recall and suspension of sales of BPO from the U.S. market.  (Id. at ¶ 53; ECF No. 55-1.)[2]  In layman's terms, Valisure reported that it

---

[2] Plaintiffs have unambiguously incorporated Valisure's citizen petition into the first amended complaint.  (ECF No. 50, ¶ 53 n.21.)  Alongside its motion to dismiss, Walgreens has moved for formal incorporation of Valisure's citizen petition.  (ECF No. 55.)  "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them."  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (cleaned up).  Because the citizen petition is a filing with a government agency, and because Plaintiff's claims necessarily rely on the

had tested and detected high levels of benzene in specific batches of BPO products, including the Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10% BPO Acne Cleansing Bar.  (ECF No. 55-1, p. 2;[3] ECF No. 50, ¶ 52.)  More specifically, Valisure stated that "current evidence suggests that on-market BPO products could produce substantial amounts of benzene when stored at above-ambient temperatures, specifically 37°C (98.6°F), 50°C (122°F) and 70°C (158°F)."  (ECF No. 55-1, p. 2.)  Additionally, Valisure also detected the substantial production of benzene "emanating externally into the air surrounding an unopened benzol peroxide product," which implicates possible inhalation exposure.  (Id. at p. 4.)  Valisure observed that the problem with benzene in BPO products is seemingly due to the "inherent instability of the benzol peroxide molecule that breaks down and forms benzene."  (Id. at p. 9) (emphasis omitted) (see ECF No. 50, ¶ 53.)

The citizen petition acknowledged the most recent guidance from the FDA, which in 2011 determined that "that benzoyl peroxide [2.5% to 10%] can be adequately labeled to minimize risks while delivering effective acne treatment."  (Id. at p. 4.)  Meanwhile prescription-strength BPO products require a warning that: "[t]he role of benzoyl peroxide as a tumor promoter has been well established in several animal species.  However, the significance of this finding in humans is unknown."  (Id.)

Valisure tested 99 different BPO products, both prescription and OTC, including two products from Walgreens, incubating the products at 122 degrees Fahrenheit for 18 days.  (Id. at pp. 16-19; see ECF No. 50, ¶¶ 51, 52.)  Results demonstrated that there was a "substantial instability of BPO and its propensity to form concerningly high levels of benzene in only 18 days."  (Id. at p. 19.)  Valisure noted that 122 degrees Fahrenheit is a reasonable temperature to test because it is a temperature the products may be exposed to during distribution and because it is an "accepted incubation temperature" used in the pharmaceutical industry.  (Id. at pp. 18-19.)[4]

---

findings detailed therein, the Court incorporates the citizen petition into the first amended complaint.  In light of this, the Court will, where appropriate, cite to the citizen petition for precision of language.

[3] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

[4] Similar findings were made when Valisure tested certain products, incubating them at 158 degrees Fahrenheit.  (ECF No. 55-1, pp. 20-22; see also ECF No. 50, ¶ 51.)

In addition, Valisure stated that it observed evidence that BPO product packaging may be porous to benzene, enabling some of the benzene "to escape into the environment or air around the package." (Id. at p. 23; see ECF No. 50, ¶ 49.)

Valisure offered a possible future remedy to address BPO instability, suggesting the creation of reformulations of BPO-containing acre treatment products. (Id. at p. 26.) Nonetheless, the citizen petition seeks, among other relief, "to have the Commissioner and FDA request recalls and a suspension of sales for products containing the active pharmaceutical ingredient benzoyl peroxide, consistent with FDA's mandate to ensure the safety of prescription and over the counter the drugs in the United States." (Id. at p. 30; see also ECF No. 55-2.)[5]

Pursuant to FDA guidance, benzene should be restricted to 2 ppm (parts per million) where its use in manufacturing "is unavoidable in order to produce a drug product with a significant therapeutic advance." (ECF No. 50, ¶ 66.) As a Class 1 solvent, benzene should not be employed in the manufacture of drug substances or drug products except in "limited cases." (Id.) In December 2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and

> remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications (21 CFR 211.84, 21 CFR 211.160). This includes testing of raw materials and finished product batches (21 CFR 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity.

(Id. at ¶ 67.) The statement also included that "[i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary

---

[5] With its motion to dismiss, Walgreens has moved for judicial notice of an August 28, 2024 response letter from the FDA regarding Valisure's citizen petition. (ECF No. 55-2.) "As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" Lee, 250 F.3d at 688, quoting Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994). Doing so would convert a motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may take judicial notice of a fact not subject to reasonable dispute, either because the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Courts may also take judicial notice of undisputed matters of public record. Lee, 250 F.3d at 689. Because the FDA response letter is a filing from a government agency and is therefore capable of accurate and ready determination from sources whose accuracy cannot be reasonably questioned, the Court takes judicial notice of the letter. In light of this, the Court will, where appropriate, cite to the FDA response letter for precision.

initiation of a recall[.]"  (Id.)  The FDA put out a substantially similar update in December 2023.  (Id. at ¶ 68.)

In the last three years, the FDA has announced over a dozen recalls of various drug and cosmetic products containing "low levers" or even "trace levels" of benzene, including hand sanitizers, aerosol sunscreens, and aerosol antiperspirants.  (Id. at ¶ 69.)  On August 28, 2024, the FDA issued formal response letter to Valisure's citizen petition, pursuant to 21 C.F.R. § 10.30(e)(2).  (ECF No. 55-2.)  The FDA response letter acknowledged the issues raised in the citizen petition along with summarizing the relief sought.  (Id.)

**III.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs in this action are Olabisi Bodunde ("Bodunde") and Monica Bolyard ("Bolyard").  (ECF No. 50, ¶¶ 14, 17.)  Bodunde is a resident and citizen of Chicago, Illinois, and within the past year she purchased multiple Walgreens branded BPO products from Walgreens stores located in Chicago, including the Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10% BPO Acne Cleansing Bar.  (Id. at ¶¶ 14, 90, 93.)  Before purchasing, Bodunde reviewed the accompanying labels and disclosures and understood that these were representations and warranties by Walgreens that the products were "properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell."  (Id. at ¶ 15.)  The products did not include a representation that they contained or risked containing benzene, a known carcinogen that has been linked to leukemia and other cancers.  (Id. at ¶¶ 1, 15, 94.)  Bodunde alleges that she relied on the representations and warranties when deciding whether to purchase BPO products, and "she would not have purchased the [p]roducts from Defendant if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell."  (Id. at ¶¶ 15, 98, 108, 112, 113; see id. at ¶¶ 75, 95-97, 104.)  Bodunde alleges that the BPO products she purchased were in effect "worthless" because "they either contained or risked containing the known carcinogen benzene."  (Id. at ¶¶ 15, 95; see id. at ¶¶ 115, 116.)  Bodunde would be willing to purchase these BPO products again, "provided that she could be

1  ensured that Defendant does not omit the presence of benzene in the [p]roducts and that the

2  [p]roducts do not contain benzene." (Id. at ¶ 16.)

3      Bolyard is a resident and citizen of Milpitas, California, and within the past two years,

4  she purchased at least one of Walgreen's products, the Walgreens branded Maximum Strength

5  10% BPO Acne Foaming Wash, from a Walgreens retail store located in Milpitas, California.

6  (Id. at ¶¶ 17, 90, 93.) Bolyard reviewed the accompanying label and disclosures on the product

7  and understood them as representations and warranties by Walgreens that the product was

8  "properly manufactured, free from defects, safe for its intended use, not adulterated or

9  misbranded, and legal to sell." (Id. at ¶ 18; see id. at ¶¶ 95-97, 104.) The product did not contain

10 a representation that it contained or risked containing benzene. (Id. at ¶¶ 18, 94, 97.) Bolyard

11 alleges that the BPO product she purchased were in effect "worthless because it either contained

12 or risked containing the known carcinogen benzene." (Id. at ¶¶ 6, 18, 95; see id. at ¶¶ 115, 116.)

13 Bolyard would not have purchased Walgreens' BPO products if Walgreens had disclosed that the

14 products contained or risked containing benzene. (Id. at ¶¶ 75, 98, 108, 112, 113.) Bolyard

15 would be willing to purchase the PBO product again, "provided that she could be ensured that

16 Defendant does not omit the presence of benzene in the [p]roduct and that the [p]roduct does not

17 contain benzene." (Id. at ¶ 19.)

18     Defendant is Walgreens, an American company that was founded in 1901 and specializes

19 in filling prescriptions, health information, and health and wellness products for conditions like

20 acne, eczema, psoriasis, and dry skin. (Id. at ¶ 26.) Walgreens is a corporate entity with its

21 principal place of business and headquarters located in Deerfield, Illinois. (Id. at ¶ 20.)[6]

22 Walgreens sells its products, including BPO-containing acne treatment products, throughout the

23 United States, including Illinois and California. (Id. at ¶¶ 21, 28.) As relevant here, Walgreens

24 sells Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10%

25 BPO Acne Cleansing Bar. (Id. at ¶ 52.) Plaintiffs allege that these products "should not have

26 contained benzene," "actually contain[ed] benzene at the time of purchase," and that Walgreens

27

28 ───────────────
[6] In 2014, Walgreens bought the 55% stake in Alliance Boots that it did not already own, and Walgreens became a subsidiary of the newly created company, Walgreens Boots Alliance, Inc. (ECF No. 50, ¶ 27.)

8

failed to disclose on its labeling or marketing that these products contained or risked containing benzene.  (Id. at ¶¶ 6, 54.)  As a corollary, Plaintiffs allege that a reasonable consumer would be led to believe that Walgreens had disclosed all material ingredients.  (Id. at ¶¶ 55, 57; see id. at ¶ 79.)  This "directly relates to the safety of the [p]roducts."  (Id. at ¶ 56.)  Plaintiffs assert that they "would not have purchased the [p]roducts, had the truth of the benzene within the [p]roducts been known or, at least, paid less for the [p]roducts."  (Id. at ¶ 57.)  Plaintiffs allege that Walgreens should have ensured that its BPO products did not contain any level of benzene, including through regular testing.  (Id. at ¶ 76.)  Thus, Plaintiffs allege that Walgreens "knew or should have known of the risks of benzene being present in the [p]roducts."  (Id. at ¶ 92.)  Plaintiffs suggest that given "Valisure's testing results, [Walgreens] made no reasonable effort to test its [p]roducts for benzene or other impurities."  (Id. at ¶ 76.)

According to Plaintiffs, the mere presence of benzene rendered Walgreens BPO products adulterated and misbranded because they failed to meet cGMP regulations.  (Id. at ¶¶ 70-71, 99, citing 21 U.S.C. § 351(a)(1).)  Plaintiffs allege that Walgreens knew or should have known of the carcinogenic potential of benzene because of its Group 1 classification.  (Id. at ¶ 102.)  Regulations dictate that adulterated or misbranded products cannot be legally distributed or sold, so therefore, Plaintiffs assert that the products they purchased were "legally worthless."  (Id. at ¶ 72; see also id. at ¶¶ 80, 99.)  Plaintiffs thereafter allege that Walgreens has violated number cGMPs in its manufacture of the BPO products at issue in this case.  (Id. at ¶ 87; see id. at ¶¶ 100, 101.)  Thus, Plaintiffs believe that Walgreens' BPO products did not conform to the final acne monograph specifications, in violation of 21 C.F.R. § 330.10(b).  (Id. at ¶ 88.)

In addition to the production errors, Plaintiffs also allege Walgreens labeled and marketed its products out of compliance with state and FDCA drug regulations, effectively concealing this information.  (Id. at ¶¶ 89, 106.)  Therefore, Plaintiffs state that Walgreens "knowingly, recklessly, or at least negligently, introduced contaminated, adulterated, and misbranded [BPO p]roducts containing or risked containing dangerous amounts of benzene into the U.S. market."  (Id. at ¶ 103; see id. at ¶ 105.)  Plaintiffs assert that had Walgreens followed the required law, the BPO products would have never been available for Plaintiffs to purchase.

(<u>Id.</u> at ¶ 108.)  Likewise, Plaintiffs state that Walgreens knew that if it had not misrepresented or omitted that the BPO products contained benzene, then Plaintiffs would not have purchased the BPO products.  (<u>Id.</u> at ¶ 107.)

Plaintiffs highlight that consumers generally lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, especially at the point of sale. (<u>Id.</u> at ¶ 109.)  Therefore, consumers must rely on Walgreens to report "truthfully and honestly" what BPO products contain on their packaging or labels.  (<u>Id.</u>)  As a retail industry leader, Plaintiffs assert that they "trusted and relied on" Walgreens' representations (and omissions) regarding the presence of benzene.  (<u>Id.</u> at ¶ 110.)  Of course, the BPO products in question did not mention benzene, neither as an ingredient nor a warning about the potential inclusion in the products.  (<u>Id.</u> at ¶ 111.)  Plaintiffs assert that Walgreens' "false, misleading, omissions [sic], and deceptive misrepresentations regarding the presence of benzene in the [BPO p]roducts are likely to continue . . . ."  (<u>Id.</u> at ¶ 114.)

Plaintiffs allege that Walgreens "was aware of the degradation issues associated with benzol peroxide."  (<u>Id.</u> at ¶ 36.)  According to Plaintiffs, Walgreens "did nothing to mitigate both the possibility of, and the harms associated with, the degradation of benzol peroxide into benzene," which also included failing to warn consumers of the risk of benzene.  (<u>Id.</u> at ¶ 37.)

On March 26, 2024, Plaintiff Bodunde commenced this action (ECF No. 1), and, following litigation not relevant here, on October 14, 2024, an amended complaint was filed by Plaintiffs Bodunde and Bolyard.  (ECF No. 50.)  Plaintiffs bring the following claims against Walgreens:

> 1) violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1, et seq.;
>
> 2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.;
>
> 3) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.;
>
> 4) violation of California's False Advertising Law ("FAL"), Cal. Bus. &

1    Prof. Code §§ 17500, et seq.;

2        5) unjust enrichment, under Illinois law;

3        6) breach of implied warranty of merchantability, under Illinois law; and

4        7) violation of state consumer fraud acts.

5  (ECF No. 50, pp. 37-50.)  For relief, Plaintiffs pray for an order certifying a proposed class; an

6  order declaring Walgreens' conduct violates the laws outline in the causes of action; an order

7  finding in favor of Plaintiffs; compensatory, statutory, and punitive damages; pre- and post-

8  judgment interest; an order of restitution "and all other forms of equitable monetary relief;"

9  injunctive relief; an order awarding Plaintiffs their reasonable attorneys' fees and costs.  (Id. at

10  pp. 50-51; see id. at ¶ 117.)

11    On November 25, 2024, Walgreens moved to dismiss the action for lack of standing and

12  failure to state a claim, and the district judge referred the motion to the undersigned for the

13  preparation of findings and recommendations.  (ECF Nos. 54, 57.)  The motion has been fully

14  briefed (ECF Nos. 60, 61), and on March 26, 2025, the Court held a hearing on the matter.  (ECF

15  No. 67.)

16    **IV.**

17    **LEGAL STANDARDS**

18    Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if a

19  plaintiff lacks Article III standing to bring suit.  Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th

20  Cir. 2011).  The standing doctrine is derived from limitation of Article III on the judicial power

21  of federal courts to hear only "actual cases or controversies."  Spokeo, Inc. v. Robins, 578 U.S.

22  330, 337 (2016) (internal quotation marks omitted).  "The doctrine limits the category of litigants

23  empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  Id. at 338.

24  Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim

25  that they press and for each form of relief that they seek."  TransUnion LLC v. Ramirez, 594

26  U.S. 413, 431 (2021).  "The irreducible constitutional minimum of standing consists of three

27  elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

28  challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

1  decision." Spokeo, 578 U.S. at 338 (cleaned up), quoting Lujan v. Defenders of Wildlife, 504

2  U.S. 555, 560-61 (1992).  A plaintiff must show that the injury was "an invasion of a legally

3  protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural

4  or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks omitted).

5       The party invoking federal jurisdiction bears the burden of demonstrating standing.

6  TransUnion, 594 U.S. at 430-31.  A jurisdictional challenge under Rule 12(b)(1) may be facial or

7  factual.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  A facial

8  challenge "asserts that the allegations contained in a complaint are insufficient on their face to

9  invoke federal jurisdiction." Id.  The "'general rule' for Rule 12(b)(1) motions challenging

10  subject-matter jurisdiction is to take allegations 'as true unless denied or controverted by the

11  movant.'" Federal Bureau of Investigation v. Fikre, 601 U.S. 234, 237 n.1 (2024), quoting 5C C.

12  Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004).  A factual

13  challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke

14  federal jurisdiction." Safe Air for Everyone, 373 F.3d at 1039.  Generally, in resolving a factual

15  attack, "the district court may review evidence beyond the complaint without converting the

16  motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness

17  of the plaintiff's allegations." Id. (citations omitted).  However, the Ninth Circuit recently

18  clarified that "when jurisdictional issues are 'intertwined with an element of the merits of the

19  plaintiff's claim,' the court must treat the motion like a motion for summary judgment and 'leave

20  the resolution of material factual disputes to the trier of fact.'" Bowen v. Energizer Holdings,

21  Inc., 118 F.4th 1134, 1143 (9th Cir. 2024), quoting Leite v. Crane Co., 749 F.3d 1117, 1122 (9th

22  Cir. 2014).

23       Additionally, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a

24  short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint

25  that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure

26  12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

27  factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft

28  v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

1   (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

2   court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

3   Id.  "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic

4   recitation of the elements of a cause of action, and must rise above the mere conceivability or

5   possibility of unlawful conduct that entitles the pleader to relief."  Somers v. Apple, Inc., 729

6   F.3d 953, 959-60 (9th Cir. 2013) (cleaned up).  "Factual allegations must be enough to raise a

7   right to relief above the speculative level."  Twombly, 550 U.S. at 555.

8        In ruling on a Rule 12(b)(6) motion, the court "accept[s] all factual allegations in the

9   complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

10  party."  Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citation

11  omitted).  But "allegations that are merely conclusory, unwarranted deductions of fact, or

12  unreasonable inferences" need not be accepted.  In re Gilead Scis. Sec. Litig., 536 F.3d 1049,

13  1055 (9th Cir. 2008) (citation omitted).  "Dismissal is appropriate when the complaint lacks a

14  cognizable legal theory or sufficient factual allegations to support a cognizable legal theory."

15  Saloojas, Inc. v. Aetna Health of Cal., Inc., 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

16                                              **V.**

17                            **DISCUSSION AND ANALYSIS**

18        Walgreens argues that Plaintiffs have failed to plead an injury-in-fact and therefore lack

19  standing to bring their claims.  (ECF No. 54, pp. 17-18.)  Relatedly, Walgreens then asserts that

20  Plaintiffs fail to state a claim because they have not alleged that that the BPO products they

21  purchased actually contained benzene.  (Id. at pp. 16-17.)  Even if Plaintiffs were to state a claim,

22  Walgreens argues that their claims are preempted by federal law (or that the FDA has primary

23  jurisdiction).  (Id. at pp. 18-22.)  Walgreens also attacks Plaintiffs' claims by arguing that certain

24  fraud claims are barred by statute, the claims fail to satisfy the pleading standard of Rule 9(b),

25  and that Plaintiffs have no cognizable basis for injunctive relief.  (Id. at pp. 22-26.)  Finally,

26  Walgreens offers that Plaintiffs' request for equitable relief must fail because Plaintiffs have

27

28

1    adequate legal remedies.  (Id. at pp. 26-27.)[7]

2        Plaintiffs oppose, arguing that they have sufficiently pleaded an economic injury that has

3    been recognized by the Ninth Circuit to confer standing.  (ECF No. 60, pp. 13-14.)  Moreover,

4    Plaintiffs clarify that their claims are based on alleged omissions by Walgreens and that they

5    adequately allege such claims.  (Id. at pp. 10-13.)  Regarding preemption, Plaintiffs assert that

6    their state law claims are permissible to proceed notwithstanding federal regulation.  (Id. at

7    pp. 15-19.)  Plaintiffs then explain how in their view the primary jurisdiction doctrine is

8    inapplicable here.  (Id. at pp. 20-21.)  Plaintiffs address in turn Walgreens' arguments regarding

9    their fraud claims and pleading standards, as well as injunctive relief.  (Id. at pp. 21-27.)  Finally,

10   Plaintiffs note that they plead their equitable relief in the alternative, and therefore, there is no

11   reason to dismiss their equitable claims at this early stage of litigation.  (Id. at p. 28.)

12       The Court first addresses the threshold issue of standing before turning to Walgreens'

13   other arguments.

14   **A.     Standing**

15       The Court begins by observing that Walgreens attack on subject-matter jurisdiction is

16   facial—*i.e.*, Walgreens attacks the allegations in the complaint as well as the incorporated citizen

17   petition from Valisure.  See Safe Air for Everyone, 373 F.3d at 1039.  Walgreens contends that

18   Plaintiffs have failed to allege an injury-in-fact because the amended complaint does not contain

19   facts that plausibly demonstrate that their BPO products contained benzene and were actually

20   unsafe and therefore have failed to plead an injury-in-fact, as required for Article III standing.

21   (ECF No. 54, p. 17.)  In particular, Walgreens argues that the amended complaint fails to

22   establish that the BPO products are unsafe and that Plaintiffs were harmed by them.  (Id.)

23       However, as also recognized in at least two other district court opinions, the Ninth

---

[7] Walgreens makes separate arguments as to how Plaintiffs are unable to state claims on behalf of the putative class. However, it is axiomatic that Plaintiffs themselves must first withstand Walgreens' motion to dismiss before they could represent a class.  See Lewis v. Casey, 518 U.S. 343, 357 (1996) ("[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (internal citation omitted); see also TransUnion LLC, 594 U.S. at 431 ("Every class member must have Article III standing in order to recover individual damages.").  Because the Court will recommend that the district judge grant Walgreens' motion to dismiss, the Court finds that any discussion of this argument would be too speculative at this time.  See Melendres v. Arpaio, 784 F.3d 1254, 1261 (9th Cir. 2015).

1 Circuit's recent decision in <u>Bowen v. Engergizer Holdings, Inc.</u>, 118 F.4th 1134 (9th Cir. 2024),

2 dispenses with Walgreens' standing argument. <u>Ottesen v. Hi-Tech Pharmaceuticals, Inc.</u>, No.

3 19-cv-07271-JST, 2024 WL 5205539, at *8 (N.D. Cal. Dec. 23, 2024); <u>Bonthon v. Procter &</u>

4 <u>Gamble Company</u>, No. 23-cv-00765-AMO, 2024 WL 4495501, at *7 (N.D. Cal. Oct. 15, 2024);

5 <u>see</u> <u>Howard v. Alchemee, LLC</u>, Nos. 2:24-cv-01834-SB-BFM; 2:24-cv-01876-SB-BFM; 2:24-

6 cv-01878-SB-BFM, 2024 WL 4272931, at *2-*5 (C.D. Cal. Sept. 19, 2024); <u>see also</u> <u>Eisman v.</u>

7 <u>Johnson & Johnson Consumer, Inc.</u>, No. 2:24-cv-01982-ODW (AJRx), 2025 WL 241024, at *2

8 (C.D. Cal. Jan. 17, 2025) (acknowledging the defendants' argument regarding standing but

9 analyzing only whether the plaintiff's claims were preempted).

10       In <u>Bowen</u>, the plaintiff brought a putative class action alleging that the defendants'

11 sunscreen products contained an unsafe level of benzene.  118 F.4th at 1140.  The plaintiff

12 alleged a myriad of claims, including California state law claims under the FAL, UCL, and

13 CLRA. <u>Id.</u> The plaintiff specifically alleged that she "would have never paid a premium for

14 sunscreen products that contained or were at risk of containing the carcinogen benzene" and that

15 she "suffered economic injury when she spent money to purchase sunscreen products she would

16 not otherwise have purchased, or [would have] paid less for, absent Defendants' misconduct

17 . . . ." <u>Id.</u> at 1141 (modification in original).  Relying on an FDA "guideline permitting 2 ppm of

18 benzene in sunscreen," the district court concluded that the plaintiff "[did] not allege facts that

19 tend to show a non-speculative increased health risk or actual economic harm" and granted the

20 defendants' motion to dismiss under Rule 12(b)(1).  <u>Id.</u>

21       The Ninth Circuit reversed.  Reaffirming precedent, the Court stated that under a theory

22 of economic harm a plaintiff "need prove only that she 'paid more for [the product] than [she]

23 otherwise would have paid, or bought it when [she] otherwise would not have done so,' <u>Hinojos</u>

24 <u>v. Kohl's Corp.</u>, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013), absent [the d]efendants' 'false

25 representations—or actionable non-disclosures—about [the product].'"  <u>Bowen</u>, 118 F.4th at

26 1147, quoting <u>McGee v. S-L Snacks National</u>, 982 F.3d 700, 706 (9th Cir. 2020).

27       Here, the Plaintiffs allege that before purchasing Walgreens BPO products, they reviewed

28 the accompanying labels and disclosures and understood that these were representations and

1    warranties by Walgreens that the products were properly manufactured, free from defects, safe

2    for their intended use, not adulterated or misbranded, and legal to sell.  Moreover, Plaintiffs

3    alleged that they relied on the representations and warranties from Walgreens when deciding

4    whether to purchase BPO products.  Plaintiffs allege that the products they purchased were in

5    effect worthless because they either contained or risked containing the known carcinogen

6    benzene.  While Plaintiffs did not have their individual products tested, they allege that Valisure

7    tested Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10%

8    BPO Acne Cleansing Bar.  Plaintiffs state that would not have purchased Walgreens' BPO

9    products if Walgreens had disclosed that the products contained or risked containing benzene.

10    Thus, under <u>Bowen</u>, the Court finds that Plaintiffs have sufficiently alleged economic harm

11    sufficient to confer Article III standing.  <u>See</u> 118 F.4th at 1146-47.[8]

12        The Court will recommend denying Defendant's motion to dismiss insofar as it seeks to

13    dismiss for lack of standing.

14        **B.    Preemption**

15        Walgreens argues that all of Plaintiffs claims are expressly and impliedly preempted by

16    the FDCA.  (ECF No. 54, pp. 19-22.)  In opposition, Plaintiffs explain that their claims are based

17    on alleged failures by Walgreens to follow cGMPs, which may form the basis of a state law

18    "parallel claim" not subject to preemption.  (ECF No. 60, pp. 15-19.)  Walgreens responds that

19    Plaintiffs have failed to allege facts that demonstrate that Walgreens failed to comply with

20    cGMPs and argues that Plaintiffs' *ipso facto* reasoning is not enough to state a claim.  (ECF

21    No. 61, pp. 6-8.)  While the parties' briefing rushes to whether Plaintiffs have provided

22    allegations that state a claim, the Court must still first address whether Plaintiffs' claims are

23    preempted.

---

24    [8] The Court notes that in <u>TransUnion LLC</u>, the Supreme Court of the United States held that the Article III standing
25    requirement of injury-in-fact requires a plaintiff allege a "concrete" injury "even in the context of a statutory
    violation."  594 U.S. at 426, quoting <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 341 (2016).  In other words, "under
26    Article III, an injury in law is not an injury in fact."  <u>Id.</u> at 427.  For purposes of an injury-in-fact, the Court
    scrutinized Plaintiff's logic chain that based on the Valisure study—that did not test the actual products Plaintiffs
27    purchased—whether it can be extrapolated that the BPO products Plaintiffs purchased even risked of containing
    benzene.  Which, if there were no risk, then there would almost certainly be no economic harm.  That said, at this
28    stage of the litigation, the Court accepts as true, as it must, the allegations that there was at least a potential risk that
    Plaintiffs suffered an economic injury for purposes of the Court's standing analysis.

1    A couple preliminaries.  Plaintiffs have clarified that their "theory is an omission theory."

2  (ECF No. 60, p. 9.)  In other words, Plaintiffs assert that they have alleged that Walgreens "failed

3  to inform consumers that its [p]roducts were illegally manufactured to contain or degrade into

4  benzene."  (Id.)  In turn, this failure reduced the economic value of the products, "which caused

5  Plaintiffs economic injury."  (Id.)  Regarding preemption, Plaintiffs state that their "claims are

6  rooted in [Walgreens'] misbranding and adulteration of Walgreens BPO Acne Products as

7  defined by the FDA's cGMP, the FDCA, and other federal regulations, validly incorporated into

8  state law, and it is those violations [of cGMPs] that form the entire basis of Plaintiffs' state law

9  allegations."  (Id. at p. 15.)  It is with this understanding that the Court considers the issue of

10  preemption.

11            **1.  Preemption Legal Principles**

12    "A fundamental principle of the Constitution is that Congress has the power to preempt

13  state law."  Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000).  Preemption

14  comes in multiple forms—express, field, and conflict preemption—but the purpose of Congress

15  is "the ultimate touchstone" for all of them.  Gilstrap v. United Air Lines, Inc., 709 F.3d 995,

16  1003 (9th Cir. 2013), quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

17    As relevant here, to ensure uniformity in the regulation of OTC drugs like Walgreens'

18  BPO products, the FDCA contains a broad express preemption provision, which provides that no

19  state "may establish or continue in effect any requirement—(1) that relates to the regulation of a

20  [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not

21  identical with, a requirement under" the FDCA.  21 U.S.C. § 379r(a).  The statute defines

22  "requirement" to include "any requirement relating to public information or any other form of

23  public communication relating to a warning of any kind for a drug."  21 U.S.C. § 379(c)(2).

24    OTC acne drug products, including Walgreens' products, are governed by a

25  comprehensive set of FDA regulations called a monograph, which includes certain labeling

26  requirements.  21 C.F.R. §§ 330.1, 330.5, 330.10; 333.350.  The acne monograph expressly

27  permits BPO to be an active ingredient in these products in an amount from 2.5 to 10 percent.  21

28  C.F.R. § 333.310(a).  Section 333.350 provides detailed instructions for labeling covered

products, including specific warnings and directions that must be included for products containing BPO.  21 C.F.R. § 333.350(c)(4), (d)(2).  The regulations provide that an OTC acne drug product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions" in the monograph and "each general condition" in 21 C.F.R. § 330.1.  Id. at § 333.301.  In turn, Section 330.1 specifies that OTC drugs must meet the conditions described therein and must be "labeled in compliance with chapter V" of the FDCA and "the format and content requirements in § 201.66."  21 C.F.R. § 330.1(c)(1).  Chapter V of the FDCA prohibits the sale of adulterated or misbranded drugs.  21 U.S.C. §§ 331(a), 351, 352.

Consistent with Congress's intent to promote uniform drug regulation, the preemptive effect of Section 379r applies not only to state legislation or regulations but also to claims under state law that would have the effect, if the defendant were liable, of imposing a requirement "at variance with FDA regulations."  Carter v. Novartis Consumer Health, Inc., 582 F. Supp. 2d 1271, 1280-83 (C.D. Cal. 2008); see also Morgan v. Albertsons Companies, Inc., No. 22-cv-02948, 2023 WL 3607275, at *4-*5 (N.D. Cal. Mar. 13, 2023).  Therefore, "state law claims regarding the labeling or packaging of [OTC drugs] that are not identical to the [FDCA] are expressly preempted."  Henning v. Luxury Brand Parnters, LLC, No. 22-cv-07011-TLT, 2023 WL 3555998, at *5 (N.D. Cal. May 11, 2023); see Gisvold v. Merck & Co., 62 F. Supp. 3d 1198, 1203 (S.D. Cal. 2014).

However, Section 379r does not preempt claims under state law that impose identical or "parallel" requirements to FDA regulations.  Riegel v. Medtronic, 552 U.S. 312, 330 (2008); see Ebrahimi v. Mentor Worldwide LLC, 804 Fed. Appx. 871, 872 (9th Cir. 2020) (mem.).   As recognized by the Ninth Circuit, the Supreme Court of the United States in "Buckman . . . left the door open to state-law claims 'parallel' to federal requirements."  McClellan v. I-Flow Corp., 776 F.3d 1035, 1040 (9th Cir. 2015); see Davidson v. Sprout Foods, Inc., 106 F.4th 842, 849 (9th Cir. 2024), discussing Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2021).  To avoid preemption, "[t]he plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted [ ]) but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)."  Perez v. Nidek Co.,

1    Ltd., 711 F.3d 1109, 1120 (9th Cir. 2013) (citation omitted) (emphasis in original).

2            **2.  Benzene Warning on Label**

3            Notwithstanding Plaintiffs' clarification on their legal theory of omission in this case, the

4    amended complaint still sets forth that the BPO products Walgreens sold were misbranded under

5    the FDCA because the labels did not disclose or warn that the products contain or might contain

6    benzene.  (See ECF No. 50, ¶¶ 15, 18 98, 103, 105, 108, 112, 113.)  However, federal labeling

7    regulations do not require such a statement, so Plaintiffs' claims, insofar as they grounded on this

8    basis, are expressly preempted.

9            The upshot of the regulations and the acne monograph, described above, is that a drug

10   that complies with all monograph requirements is not misbranded.  21 C.F.R. § 330.10(a)(1)

11   ("The Commissioner shall . . . evaluate the safety and effectiveness of OTC drugs, to review

12   OTC drug labeling, and to advise him on the promulgation of monographs establishing

13   conditions under which OTC drugs are generally recognized as safe and effective and not

14   misbranded"); see also 21 C.F.R. § 333.301(a) ("An over-the-counter acne drug product in a

15   form suitable for topical application is generally recognized as safe and effective and is not

16   misbranded if it meets each of the conditions in this subpart and each general condition

17   established in § 330.1 of this chapter.").

18           Here, the acne monograph lists BPO as a permitted active ingredient and does not require

19   manufacturers to warn consumers of benzene, or mention benzene in any capacity on the label.

20   U.S. Food & Drug Admin., Over-the-Counter (OTC) Monograph M006: Topical Acne Drug

21   Products for Over-the-Counter Human Use; see also 21 C.F.R. § 333.310(a); 21 C.F.R.

22   § 333.350(c)(4).  The FDA's monograph "allows [topical acne drugs] to be formulated with the

23   active ingredient [BPO] and does not require disclosure that [BPO] may degrade into [benzene]."

24   Williams v. Galderma Laboratories, L.P., No. 24 CV 2222, 2024 WL 4213220, at *3 (N.D. Ill.

25   Sept. 17, 2024), quoting Truss v. Bayer Healthcare Pharms. Inc., No. 21 CV 9845 (VB), 2022

26   WL 16951538, at *4 (S.D.N.Y. Nov. 15, 2022); see Mut. Pharm. Co. v. Bartlett, 570 U.S. 472,

27   488-90 (2013).

28           Therefore, to the extent Plaintiff's claims are based on allegations that Walgreens should

1    have warned about the presence of benzene on Walgreen's BPO product labels, that theory is

2    expressly preempted because it would be an "addition" not required by federal law.  21 U.S.C.

3    § 379r(a);  see Howard, 2024 WL 4272931, at *7.   The Court will recommend granting

4    Walgreen's motion to dismiss as to this aspect of preemption.

5                    **3.  Benzene as an Inactive Ingredient**

6         While not fully expanded upon by the parties, the Court notes that Plaintiffs set

7    groundwork for their claims to be based on that benzene should have been listed as an inactive

8    ingredient on Walgreens' BPO label.  (ECF No. 60, pp. 16-18.)  However, because Walgreens

9    did not intend for benzene to end up in its BPO products, claims based on this theory are

10   preempted.

11        Federal regulations require drug manufacturers to list all active and inactive ingredients

12   on the drug's label.  21 C.F.R. § 201.66(c).  Active ingredients, such as BPO, are those that are

13   "intended to furnish pharmacological activity" in the human body.   Id. at § 201.66(b)(2).

14   Inactive ingredients, by contrast, are "any component other than an active ingredient."   Id. at

15   § 201.66(b)(8).

16        Whether Walgreens needed to list benzene as an inactive ingredient on its BPO products'

17   labels turns on whether benzene is a "component."  That term is not defined in part 201, which

18   relates to labeling requirements.  Component is defined, however, in a different portion of the

19   same subchapter related to manufacturing: "Component means any ingredient intended for use in

20   the manufacture of a drug product, including those that may not appear in such drug product."

21   21 C.F.R. § 210.3(b)(3).  If this definition is used, then benzene is not an inactive ingredient

22   because it is not intended for use; it is an "unintended contaminant."   Williams, 2024 WL

23   4213220, at *4 (internal quotation omitted).

24        In resisting this understanding of the term "component," Plaintiffs instead offer

25   generalized and unsupported principles of statutory interpretation.  (ECF No. 60, p. 17.)  Then,

26   Plaintiffs assert that "[t]he labeling of a drug product is different.  If manufacturing is about the

27   process, labeling is about the final result.   It is not about what materials were initially intended

28   to be in the drug, but rather what materials are actually in the end product."  (Id.)  Based on this,

20

1   Plaintiffs suggest that "[l]abeling and manufacturing are two completely separate and distinct

2   processes with different considerations involved, and therefore need two completely different

3   sets of requirements and accompanying definitions."  With this logic, Plaintiffs offer that the

4   Court should apply the definition of "component" in 21 C.F.R. § 201.66—as opposed to 21

5   C.F.R. § 210.3(b)(3)—which relates to labeling and defines the term "inactive ingredient" as

6   "any component other than an active ingredient."  Id.

7        The Court observes that Plaintiffs' argument is on uneven footing.  Instead, the Court

8   finds persuasive the approach taken by multiple district courts in substantially similar contexts

9   regarding how to give effect to the term "component."  To begin with, both part 210 and part 201

10  "are within the same subchapter regulating drugs, and 21 C.F.R. § 210.3(b)(3) provides the only

11  definition of 'component' within the subchapter."  Williams, 2024 WL 4213220, at *4, quoting

12  Barnes v. Unilever United States Inc., No. 21 C 6191, 2023 WL 2456385, at *7 (N.D. Ill. Mar.

13  11, 2023); see Truss, 2022 WL 16951538, at *4.  Second, when the FDA added the definition of

14  "inactive ingredient" to part 201, it noted "that the definition 'is identical to the definition in the

15  agency's good manufacturing practice regulations in 21 CFR 210.3(b)(8).'"  Id., quoting Over-

16  The-Counter Human Drugs; Labeling Requirements, 64 Fed. Reg. 13254, 13258 (Mar. 17,

17  1999).  Therefore, because "the FDA notes that the definitions are identical, it follows that the

18  term 'component' used in both definitions was intended to have the same meaning."  Id., quoting

19  Barnes, 2023 WL 2456385, at *7.

20       Accordingly, the Court disagrees with Plaintiffs that the mere fact that manufacturing and

21  labeling are different steps in the process of bringing a drug to market means that the FDA

22  necessarily wanted to use distinct definitions for the same term.  Rather, the Court concludes that

23  it is more rational that the FDA would impose consistent requirements and definitions on

24  manufacturers.  Williams, 2024 WL 4213220, at *4; see Howard, 2024 WL 4272931, at *8;

25  Barnes, 2023 WL 2456385, at *7; Truss, 2022 WL 16951538, at *4; see also Eisman, 2025 WL

26  241024 at *4 (OTC Coal Tar drug monograph).  Plaintiffs have not pointed the Court to any

27  authority to the contrary.

28       Based on the forgoing, the Court concludes that benzene is not an inactive ingredient

1  under federal law and Walgreens was therefore not required to list it on its BPO-product labels.

2  The Court will recommend granting Walgreens' motion to dismiss insofar as Plaintiffs seek to

3  use this preempted theory as a basis for their claims.

### 4. Benzene as a Result of cGMP Violations

5      The Court turns to whether Plaintiffs' claims can proceed under the theory that the

6  presence of benzene in Walgreens' BPO products stems from Walgreens' alleged failure to

7  adhere to cGMPs.  (ECF No. 60, p. 18-19.)  Whether and to what extent cGMPs may form the

8  basis of parallel state-law claims has recently been explored by the Ninth Circuit.  In <u>Davidson v.</u>

9  <u>Sprout Foods, Inc.</u>, the Ninth Circuit discussed two lines of case.  106 F.4th 842 (9th Cir. 2024).

10  The Court first observed the line of cases where private citizens attempted to directly enforce the

11  FDCA but discussed that those claims were held to be impliedly preempted.  <u>Id.</u> at 849.  Second,

12  the Court noted cases where a private citizen brought state law claims that paralleled duties owed

13  under federal requirements.  <u>Id.</u> at 849-50.  The Ninth Circuit reaffirmed its position that a

14  plaintiff can potentially raise a parallel state law claim without implicating implied preemption if

15  the state law imposing requirements are identical to those contained in the FDCA, before

16  specifically holding that "the FDCA [did] not impliedly preempt [the] plaintiffs' [California

17  parallel] claims."  <u>Id.</u> at 850.

18      Here, Plaintiffs allege violations of federal law: drugs are considered adulterated when

19  not manufactured in accordance with cGMPs.  <u>See</u> 21 U.S.C. § 331(a); 21 C.F.R. § 351(a)(2)(B).

20  To vindicate their rights, Plaintiffs bring various state law consumer fraud and related claims—

21  not relying on the FDCA.  In its reply, the Court notes that Walgreens does not press this point,

22  instead moving swiftly on to whether Plaintiffs nonetheless fail to state a claim.  (ECF No. 61,

23  pp. 5-8.)

24      Therefore, the Court concludes that to the extent Plaintiffs' state law claims are parallel

25  claims brought for violations of cGMPs, those claims are not categorically preempted.  The

26  Court will recommend denying Walgreens' motion as to this aspect of preemption.

### C. ICFA Safe Harbor Provision

28      Walgreens also argues that Plaintiffs' ICFA claim is barred by that statute's "safe harbor"

provision. (ECF No. 54, p. 22-23.) That provision precludes non-personal-injury claims predicated on "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." 815 ILCS 505/10b(1). In other words, the ICFA "will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations." Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 941 (7th Cir. 2001). The safe harbor exception is an affirmative defense, which is typically not an appropriate basis for dismissal pursuant to Rule 12(b)(6). Bojko v. Pierre Fabre USA Inc., No. 22 C 6728, 2023 WL 4204663, at *6 (N.D. Ill. June 27, 2023). However, an affirmative defense can serve as a basis for Rule 12(b)(6) dismissal where the plaintiff's complaint alleges everything necessary to establish the affirmative defense. Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc., 782 F.3d 922, 938 (7th Cir. 2015).

Based on the allegations, the Court cannot conclude that federal law "specifically authorizes" the alleged conduct at issue. Walgreens' sale of allegedly adulterated BPO products is not "specifically authorized." 21 U.S.C. § 331(a) (prohibiting the sale of cosmetics that are "adulterated"). Nor is the lack of any warning about the presence of benzene in the BPO products "specifically authorized." 21 U.S.C. § 331(a) (prohibiting the sale of cosmetics that are "misbranded"); 21 C.F.R. § 740.1(a) ("The label of a cosmetic product shall bear a warning whenever necessary or appropriate to prevent a health hazard that may be associated with the product."). The fact that federal law potentially allows for the omission of benzene from the ingredients list does not "implicitly provide[ ] specific authorization not to make any additional disclosures" on the labels about its presence in the products. Bojko, 2023 WL 4204663, at *6, quoting Price v. Philip Morris, Inc., 219 Ill. 2d 182, 252 (2005). As such, the Court finds that the safe harbor provision does not warrant dismissal of the ICFA claim, and the Court will recommend denying this aspect of Walgreens' motion to dismiss.

### D. Failure to State a Claim

Walgreens argues that because all of Plaintiffs' claims sound in fraud, which requires a heightened pleading standard, Plaintiffs have failed to state a claim. (ECF No. 54, pp. 23-25.) Plaintiffs oppose, arguing that they have sufficiently alleged that Walgreens deceptively omitted

a benzene warning.  (ECF No. 60, p. 24-26.)  Walgreens replies that Plaintiff has failed to allege a violation of cGMPs (beyond bald allegations that require circuitous logic) as well as failed to connect how a violation of cGMPs would have deceived Plaintiffs.  (ECF No. 61, pp. 7-8.)  With this in mind, Walgreens then brings forth a nuanced argument that circles back to issues of standing and preemption.

In alleging a claim grounded in fraud, "a party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  A court may dismiss a claim for failing to satisfy the heightened pleading requirements of Rule 9(b).  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003).  Under this heightened pleading standard, a party must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false."  Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1019 (9th Cir. 2020), quoting Davidson v. Kimberly-Clark, 889 F.3d 956, 964 (9th Cir. 2018).  The complaint must contain enough detail to put a defendant on notice of the alleged misconduct so they may "defend against the charge and not just deny that they have done anything wrong."  Vess, 317 F.3d at 1106.  "[C]laims based on an omission can succeed without the same level of specificity required by a normal fraud claim."  Miller v. Ford Motor Co., No. 2:20-cv-01796-TLN-CKD, 620 F. Supp. 3d 1045, 1068 (E.D. Cal. Aug. 10, 2022) (citation and internal quotation marks omitted).  When a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of that claim, that claim is said to be "'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b)."  Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (discussing in context of CLRA and UCL claims).

Walgreens attacks Plaintiffs' allegations regarding the "when," "where, and "how." (ECF No. 54, pp. 24-25; ECF No. 61, pp. 6-8.)  The Court takes these in turn.  Beginning with "when," the Court finds that Plaintiffs have sufficiently alleged with particularity a timeframe. Plaintiff Bodunde alleges that she purchased a Walgreen's BPO product within the past year prior to filing the complaint; Plaintiff Bolyard alleges she purchased a Walgreens' products with the past two.  See United States v. United Healthcare Insurance Company, 848 F.3d 1161, 1180

(9th Cir. 2016).  Walgreens' offered precedent is not persuasive because those cases involved vague timeframe allegations.  See Robinson v. Unilever United States, Inc., No. CV 17-3010-DMG (AJWx), 2018 WL 6136139, at *6 (C.D. Cal. Jun. 25, 2018) (discussing that the allegation that "[i]n the last several years" was insufficient, in part, to state a claim under Rule 9(b)); Celador Int'l, Ltd. v. Walt Disney Co., 347 F. Supp. 2d 846, 855 (C.D. Cal. 2004) (discussing that the allegation "[p]rior to December 1, 1998," was insufficient to state when because that allegations could "mean anytime-days, months, years-prior to that date").

Next, the Court finds that Plaintiffs have sufficiently alleged "where" they purchased the products.  In particular, Plaintiff Bodunde bought Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10% BPO Acne Cleansing Bar from Walgreens retail stores in Chicago, Illinois; Plaintiff Bolyard bought the Walgreens branded Maximum Strength 10% BPO Acne Foaming Wash product from a Walgreens retail store located in Milpitas, California.  (ECF No. 50, ¶¶ 14, 17.)  Again, Walgreens' precedent is not persuasive because in Seale, the plaintiff alleged buying a product at potentially three stores in potentially four cities.  Seale v. GSK Consumer Health, Inc., 718 F.Supp.3d 1208, 1228 (C.D. Cal. 2024) ("[The Plaintiff] vaguely states only that she purchased 'various adult's and children's Robitussin products . . . at CVS, Walmart, and/or Walgreens stores in Encino, CA, Tarzana, CA, West Hills, CA, and/or Reseda, CA' without providing which products were purchased where.").  Rule 9(b) does not require a plaintiff to "describe in detail a single specific transaction," United Healthcare Ins. Co., 848 F.3d at 1180, and the Court finds that Plaintiffs has satisfied "where" they purchased their products.

However, the Court finds that Plaintiff have not sufficiently alleged "how" they were deceived.  To begin, Plaintiffs note in their opposition that they have alleged that the BPO products actually contained benzene at the time of purchase.  (ECF No. 50, ¶ 6.)  In the amended complaint, Plaintiffs also allege that the mere presence of benzene rendered Walgreens BPO products adulterated and misbranded because they failed to meet cGMP regulations.  (Id. at ¶¶ 70, 71, 99.)  Plaintiffs then allege that Walgreens has violated number cGMPs in its manufacture of the BPO products at issue in this case.  (Id. at ¶ 87; see id. at ¶¶ 100, 101.)  While Plaintiffs have listed at least 22 cGMPs that Walgreens purportedly violated, the Court finds that

1  Plaintiffs have not alleged facts that either establish that Walgreens allegedly violated the subject

2  cGMPs, or even if Walgreens did violate the cGMPs, how those violations ultimately deceived

3  Plaintiffs.

4  For example, Plaintiffs have alleged that Walgreens violated 21 C.F.R. § 211.100(a), (b),

5  which requires that Walgreens establish and follow "written procedures for production and

6  process control designed to assure that the drug products have the identity, strength, quality and

7  purity they purport or are represented to possess." (Id. at ¶ 87(a).)  In another example, Plaintiffs

8  allege that Walgreens violated 21 C.F.R. § 211.22(d), which requires that Walgreens "to follow

9  the responsibilities and procedures applicable to the quality control unit impacting on the purity

10 of the drug product." (Id. at ¶ 87(o).)  Beyond bald assertions, there are no facts from which the

11 Court can infer that Walgreens failed to establish and follow written procedures, failed to follow

12 responsibilities to the quality control unit, or how such failures would have deceived Plaintiffs.

13 Plaintiffs' remaining citations to the cGMPs in the C.F.R. all suffer from the same problem.  (See

14 id. at ¶ 87(a)-(v).)  As Walgreens points out, it appears that Plaintiffs are aware of this flaw on

15 some level with their allegation "[t]hat [Walgreens]'s Products were able to reach the U.S.

16 market with such high levels of benzene indicates that there was a critical failure in

17 [Walgreens]'s quality control and testing protocols as required by the above-referenced cGMPs

18 as incorporated into state law." (Id. at ¶ 89.)  In other words, Plaintiffs seemingly rely on the

19 circular reasoning that because benzene was found after testing products that made it to the U.S.

20 market, there must have necessarily been a violation of the cGMPs by Walgreens.

21 While in the context of a Class III medical device and on appeal following summary

22 judgment, the Ninth Circuit discussed in Weber that "[r]es ipsa loquitor" was not enough to

23 survive the relevant FDA preemption. 940 F.3d at 1113.  Relatedly, the Weber Court continued,

24 discussing that even assuming without deciding that cGMPs can form the basis of the relevant

25 state parallel claim, the plaintiff had failed to state a claim because "the mere evidence

26 suggesting that her particular [medical device] was defective does not show that [the defendant]

27 failed to comply with the FDA's Current Good Manufacturing Practices." Id.  While not an

28 exact analogy, the Court is persuaded by the logical underpinnings of Weber and finds that

1    Plaintiffs' allegations do not meet Rule 9(b) pleading standards because they are too conclusory

2    and rely on circular reasoning.

3        Plaintiffs' reliance on Williams on this issue is not persuasive.  2024 WL 4213220.

4    While up to this point the Court has agreed with analysis of Williams, a district court opinion

5    from the Northern District of Illinois, regarding preemption and that cGMPs may for the basis of

6    state parallel claims, the Court parts ways regarding pleading with particularity as required by

7    Rule 9(b).  Similar to here, in Williams, the plaintiff alleged that the defendant, a manufacturing

8    laboratory, manufactured an OTC acne product that degraded into benzene, utilizing the same

9    Valisure study implicated in this case.  Id. at *1.  Among other claims, the plaintiff brought

10   unfair and deceptive practices claim under the Illinois Consumer Fraud and Deceptive Business

11   Practices Act (the same law as Plaintiff Bolyard brings part of her claims here).  Id.  As relevant

12   here, regarding potential parallel state law claims, the district court discussed that in its view

13   another district court opinion, from the Northern District of Illinois, was instructive and

14   essentially adopted that court's reasoning.  Id., citing Barnes v. Unilever United States Inc., No.

15   21 C 6191, 2023 WL 2456385 (N.D. Ill. Mar. 11, 2023).

16       However, the Court finds that the case relied upon in Williams to be distinguishable.  In

17   Barnes, the plaintiffs sued alleging that the defendant manufactured antiperspirant aerosol and

18   spray products that contained benzene and distributed those products in retail stores in the United

19   States.  2023 WL 2456385, at *1.  Not unlike this case, the plaintiffs relied upon a study

20   produced by Valisure that found that certain antiperspirant aerosol products contained benzene

21   when tested.  Id.  Critically, "[t]he amended complaint also identifie[d] several statements

22   regarding product safety and testing from [the defendant's] website that [the plaintiffs] allege[]

23   are false and misleading."  Id. at *2.  In its analysis of under Rule 9(b), the court in Barnes

24   focused on that the plaintiff's claims were premised on "the [defendant] website's safety

25   statements," which the plaintiffs had alleged were false.  Id. at *4.  The Barnes court then relied

26   upon Seventh Circuit authority, in a trademark deception case, that observed that a "complaint

27   [wa]s sufficient" where it "allege[d] precisely the statement . . . that is asserted to be false, and

28   the exact reason . . . why the statement was false."  Id., quoting Vincent v. City College of

*Chicago*, 485 F.3d 919, 925 (7th Cir. 2007).  In other words, while the plaintiffs in Barnes were bringing parallel state law claims regarding potential violations of cGMPs as to aerosol antiperspirant sprays, the plaintiffs also alleged that the defendant had affirmatively made false statements on their website.  *Id.*  By contrast, here, Plaintiffs have alleged, and explicitly endorsed, that they proceed only on a theory of omission—*i.e.*, Walgreens "failed to inform consumers that its [p]roducts were illegally manufactured to contain or degrade into benzene." (ECF No. 60, p. 9.)  Therefore, the analysis in Barnes and Vincent is inapposite to the case at bar.  See Bojko, 2023 WL 4204663, at *7-*8 (contrasting affirmative statements against omissions).  And because Williams relied upon these cases for its determination that the plaintiff had met Rule 9(b) pleading standards, the Court finds Williams to not be persuasive on this point.[9]

In sum, the Court finds that Plaintiffs have failed to state a claim regarding those claims not preempted.  Therefore, the Court will recommend granting Walgreens' motion to dismiss as to state law parallel claims not preempted.

### E.    Primary Jurisdiction Doctrine

In the alternative, Walgreens argues that the Court should stay or dismiss this action under the primary jurisdiction doctrine.  (ECF No. 54, pp. 21-22.)  "Primary jurisdiction is a prudential doctrine that permits courts to determine 'that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.'"

---

[9] The Court also addresses a potential logical fallacy that Walgreens has identified.  Walgreens begins by noting that the basis of Plaintiffs' claims arises solely from the Valisure study, alleging that the purported failure by Walgreens to comply with the cGMPs is "based on Valisure's testing results . . ."  (ECF No. 50, ¶ 76.)  Plaintiffs do not shy away from their allegations that Valisure tested similar but not the exact products they purchased.  Walgreens then observes that Plaintiffs are proceeding under two theories that are seemingly in conflict with each other.  On the one hand, Plaintiffs operate from the position that all of Walgreens BPO products break down into benzene, perhaps due to BPO's inherent instability, which gives them standing insofar as this would create an economic injury sufficient for standing.  On the other hand, Plaintiffs at the same time assert that it was Walgreens' failure to comply with cGMPs that led to benzene in its products.  However, for that to be true, benzene contamination in Walgreens' BPO products would not have been an inevitability but rather a by-product of Walgreens' manufacturing process.  This premise would potentially undermine Plaintiffs' standing premise that all BPO products necessarily degrade into benzene.  Moreover, Walgreens posits that should Plaintiffs rely on cGMPs as a basis for their injury, they will be required to plead facts that demonstrate as such.  While this seeming paradox is well-taken, the Court need not reach this issue at this moment because the Court has found that Plaintiffs have otherwise failed to state a claim.

1  Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 760 (9th Cir. 2015) (citation omitted).  "[T]he

2  doctrine of primary jurisdiction is committed to the sound discretion of the court when

3  'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which

4  administers the scheme.'"  Syntek Semiconductor Co. v. Microchip Tech. Inc., 307 F.3d 775,

5  781 (9th Cir. 2002) (citation omitted).  Given that the Court has found that Plaintiffs have failed

6  to state a claim, the Court finds that addressing the issue of primary jurisdiction would be

7  premature.

8        **F.**     **Injunctive and Equitable Relief**

9       Separately, Walgreens argues that Plaintiff have failed to plead allegations that would

10  afford them standing for injunctive relief and that Plaintiffs may not plead equitable relief in the

11  alternative when they have an adequate remedy in law.  (ECF No. 54, pp. 25-26.)  Again,

12  because the Court has found that Plaintiffs have failed to state a claim, the Court finds that

13  discussion of these issues would be premature.

14        **G.**     **Leave to Amend**

15       Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend shall be freely

16  given when justice so requires.  Fed. R. Civ. P. 15(a)(2).  "In the absence of . . . undue delay, bad

17  faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

18  amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

19  the amendment, futility of amendment, etc.—the leave sought should . . . be 'freely given.'"

20  Foman v. Davis, 371 U.S. 178, 182 (1962), quoting Fed. R. Civ. P. 15(a).  In other words,

21  "[a]bsent prejudice, or a strong showing of any of the remaining Foman factors, there exists a

22  presumption under Rule 15(a) in favor of granting leave to amend."  Eminence Capital, LLC v.

23  Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003).

24       The Court finds that leave to amend should be granted in its entirety.  The Court observes

25  that Plaintiffs operated in their amended complaint from the understanding that certain theories

26  were not preempted by federal law, which allowed them to bring an aspirational complaint in

27  terms of theories and relief.  Notwithstanding the Court's conclusions regarding preemption and

28  the plausibility of Plaintiffs' claims as presently pleaded, the Court will recommend granting

leave to amend with the understanding that Plaintiffs will do so only to the extent they believe in good faith they can plead additional factual material that could satisfy the legal standards and deficiencies identified above.  See Fed. R. Civ. P. 15(a)(2); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000).

## VI.

### CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' motion to dismiss (ECF No. 54) be GRANTED as follows:

1.  The motion to dismiss as to standing be DENIED;

2.  The motion to dismiss as to preemption of theories of failure to include a warning label of benzene and failure to include benzene as an inactive ingredient be GRANTED with leave to amend;

3.  The motion to dismiss as to preemption on the theory that cGMPs may form the basis of state parallel claims be DENIED;

4.  The motion to dismiss as to the ICFA safe harbor provision be DENIED;

5.  The motion to dismiss as to failure to state a claim be GRANTED with leave to amend; and

6.  The remainder of the motion to dismiss be DENIED as MOOT.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. **Within fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **May 15, 2025**

STANLEY A. BOONE
United States Magistrate Judge