# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLABISI BODUNDE, *individually and on behalf of all others similarly situated*, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALGREENS BOOTS ALLIANCE, INC.,<br><br>Defendant. | Case No. 1:24-cv-00985-JLT-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS<br><br>(ECF No. 84)<br><br>**OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is Defendant Walgreens Boots Alliance, Inc.'s ("Walgreens") motion to dismiss. (ECF No. 84.) The Court held a hearing on April 29, 2026. Trenton Kashima, Esq., appeared on behalf of Plaintiffs. Rick Shackelford, Esq. appeared on behalf of Walgreens. Having considered the moving papers and arguments by counsel, as well as the Court's file, the Court issues the following findings and recommendations recommending granting in part and denying in part Walgreens' motion to dismiss.

## I.

## REGULATORY BACKGROUND

Acne treatments, including benzol peroxide ("BPO"), are "drug" products that are regulated by the U.S. Food and Drug Administration ("FDA"), pursuant to the Food, Drug, and Cosmetics Act ("FDCA"). (ECF No. 78, ¶ 79.) Over-the-counter ("OTC") drugs are regulated by the FDA and must be safe and effective. (Id. at ¶ 80.) OTC drugs are subject to federal

current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state law analogues. (Id. at ¶ 79; see id. at ¶ 103.) The cGMP regulations require OTC drug products meet safety, quality, purity, identity, and strength standards. (Id. at ¶¶ 80, citing 21 U.S.C. § 351(a)(2)(B); see id. at ¶ 103.) The cGMPs

> establish minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess.

(Id. at ¶ 81, quoting 21 C.F.R. § 210.1(a).) In other words, these regulations cover design, manufacture, and distribution of OTC drug products. (Id. at ¶ 81.) Moreover, cGMP regulations set minimum standards for organization and personnel; buildings and facilities; equipment; control of components and drug product containers and closures; production and process controls; packaging and label controls; holding and distribution; laboratory controls; records and reports; and returned and salvaged drug products. (Id. at¶ 82.) So long as drugs are intended to be distributed in the United States, the FDA has "worldwide jurisdiction" to enforce cGMP regulations. (Id. at ¶ 82.) "Any drug not manufactured in accordance with cGMPs is deemed 'adulated' or 'mislabeled' and may not be distributed or sold in the United States." (Id. at ¶ 83, citing 21 U.S.C. §§ 331(a), 351(a)(2)(B); see id. at ¶¶ 92, 93.) Plaintiffs allege that "[s]tates have enacted laws adopting or mirroring these federal standards." (Id. at ¶ 83; see id. at ¶ 105.)[1] FDA regulations also include that drug product manufacturers have "written procedures" for production and process control designed to comply with cCMPs. (Id. at ¶ 84, citing 21 C.F.R. § 211.100.) A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process

---

[1] For example, Plaintiffs allege that the Illinois Food, Drug and Cosmetic Act expressly adopted the federal labeling requirements, including the definition of "adulterated." (ECF No. 78, ¶ 94.)

Other jurisdictions Plaintiffs cite to are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Georgia, Guam, Hawaii, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Vermont, Virginia, West Virginia, and Wyoming. (Id. at ¶ 104.)

materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." (Id. at ¶ 85, quoting 21 C.F.R. § 211.160.) "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." (Id. at ¶ 86, quoting 21 C.F.R. § 211.194(a)(6).)

An OTC drug monograph establishes conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic category (*e.g.*, sunscreen, acne medication) is generally recognized as safe and effective ("GRASE") for its intended use. (See id. at ¶¶ 106.) Plaintiffs note that "[a]ny product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." (Id. at ¶ 107, quoting 21 C.F.R. § 330.10(b).) In other words, once a final monograph goes into effect, it is illegal to sell or advertise a drug that no longer conforms to "each of the conditions contained in this part [330.1] and in an applicable monograph[.]" (Id. at ¶ 108, quoting 21 C.F.R. § 330.1; see id. at ¶¶ 123-24.) The "conditions contained in this part"—*i.e.*, the conditions under which the FDA designates an OTC drug as GRASE—include a requirement that "(a) [t]he product is manufactured in compliance with current good manufacturing practices, as established by parts 210 and 211 of this chapter." (Id. at ¶ 108, quoting 21 C.F.R. § 330.1(a).) In turn, parts 210 and 211 describe the cGMPs described above. (Id. at ¶¶ 109-11.)

As relevant here, Plaintiffs report that in in 1991, the FDA "posted an amendment to the monograph for OTC topical acne products because "the agency became aware of a 1981 study by Slage et al. . . . that raised a safety concern regarding benzol peroxide as a tumor producer in mice and a 1984 study by Kurokawa, et al. . . . that reported benzol peroxide to have tumor initiation potential." (Id. at ¶ 142.) The "FDA determined that further study is necessary to adequately assess the tumorigenic potential of benzol peroxide." (Id. at ¶ 142.) By 2010, the FDA published a final monograph on BPO "along with summarizing results from further studies

on the potential carcinogenicity of [BPO] and actions of the FDA Advisory Committee. (Id. at ¶ 143.)

Plaintiffs note that sometime after 1992 but before 1995, the Advisory Committee:

> recommended, by a four-to-three vote (with one abstention), that the known safety data regarding the tumor promoting potential of benzoyl peroxide should be communicated to consumers. Because this data was inconclusive, the Committee unanimously agreed that the word "cancer" should not be included in the labeling of acne drug products containing benzoyl peroxide. The Committee was concerned that the word "cancer" would cause consumers to avoid using these products (even though the data were inconclusive). The Committee did not believe the data adequately demonstrated that benzoyl peroxide was unsafe, and they recognized that benzoyl peroxide is effective in treating acne. Therefore, the Committee unanimously recommended that acne drug products containing benzoyl peroxide should remain on the market while the additional safety studies were being conducted.

(Id. at ¶ 143, quoting Classification of Benzoyl Peroxide as Safe and Effective and Revision of Labeling to Drug Facts Format; Topical Acne Drug Products for Over-The-Counter Human Use; Final Rule ("Final Rule"), 75 FR 9767-01, 2010 WL 723253, at *9769-*70 (F.R. Mar. 4, 2010).)

In 2010, in adopting a Final Rule, the Advisory Committee made the following findings:

> We now conclude that benzoyl peroxide, in concentrations of 2.5 to 10 percent, is GRASE for the OTC topical treatment of acne. This conclusion is based on safety data that we received and evaluated since publication of the 1995 proposed rule that proposed classifying benzoyl peroxide as Category III. As recommended by the Committee, these new data include studies examining the carcinogenic and photocarcinogenic potential of benzoyl peroxide. In addition to discussing these new studies in this section of the document, we provide a summary of earlier studies discussed in previous OTC acne drug product rulemakings. We believe the combined results of the earlier and new studies support the GRASE finding for benzoyl peroxide (see section IV.G of this document).

Final Rule, 75 FR 9767-01, 2010 WL 723253, at *9769.

## II.

## BENZENE, BENZOL PEROXIDE, AND BPO PRODUCT BACKGROUND

Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, including gasoline. (ECF No. 78, ¶ 29.) The health hazards of benzene have been recognized for over one hundred

years, which includes acute and long-term adverse health effects like cancer or hematological effects. (Id. at ¶¶ 29, 30.) Numerous organizations—including the CDC, WHO, NCI, National Toxicology Program, and International Agency for Research on Cancer—have recognized health hazards regarding benzene. (Id. at ¶¶ 31-35.)

The FDA recognizes that "[b]enzene is a carcinogen that can cause cancer in humans" and classifies benzene as a "Class 1" solvent that should be "avoided" in drug manufacturing. (Id. at ¶ 36.) Plaintiffs allege that benzene is restricted by the FDA to "2 ppm where its use in manufacturing 'is unavoidable in order to produce a drug product with a significant therapeutic advance.'" (Id. at ¶ 87; see id. at ¶ 115.) FDA guidance provides that "[s]olvents in Class 1 should not be employed in the manufacturing of drug substances, excipients, and drugs products because of [its] unacceptable toxicity." (Id. at ¶ 36; see id. at ¶ 87.)

BPO is a diacyl peroxide with bacterial activity and is widely used as a treatment for acne. (Id. at ¶ 54.) BPO is the active ingredient in Walgreens' BPO products. (Id. at ¶ 54.) Plaintiff's allege that "BPO . . . unavoidably degrades with enough time and heat to directly form benzene." (Id. at ¶ 54; see id. at ¶ 133.) "The issue of BPO decomposition into benzene has been previously identified and acted upon in industries other than in the acne treatment product industry." (Id. at ¶ 134; see id. at ¶ 136.) For example, chemical evidence of carcinogenicity has been reported since at least 1981. (Id. at ¶ 141.) "Benzene is created in Defendant's Products, because BPO has a known, inherent propensity to thermally decompose into two molecules of benzoic acid radicals that further decompose to benzene radicals with liberation of carbo dioxide. The benzene radicals then produce benzene." (Id. at ¶ 55.) According to Plaintiffs, the process is accelerated by exposure to elevated temperatures equivalent to the temperature of "hot cars/trucks/shipping containers or in improperly regulated manufacturing facilities." (Id. at ¶ 56.)

That said, Plaintiffs also allege that not all BPO-based acne treatments contain benzene in unacceptable amounts, if at all. (Id. at ¶ 57.) In Plaintiffs' view, "some brands are able to either formulate their BPO-based acne treatments or adopt proper manufacturing controls, to ensure that the BPO does not degrade into benzene during the manufacturing or holding process." (Id.

at ¶ 57.) In other words, benzene development in BPO products can be reduced and prevented, especially with regard to proper temperature storage. (Id. at ¶ 58; see id. at ¶ 139.)

Due to the inherent risk of benzene contamination, "in process and finished product testing is required" to ensure that the BPO has not improperly degraded. (Id. at ¶ 59.) Plaintiffs allege that the FDA has noted that cGMPs include requirements for testing that ensure that products are stable throughout shelf-life. (Id. at ¶ 60.) On information and belief, Plaintiffs allege that the benzene contamination within Walgreens' BPO products is "inherent to Defendant's manufacturing and holding processes, rendering all of the Products uniformly adulterated with benzene." (Id. at ¶ 63.)

Valisure LLC ("Valisure") is an analytical laboratory and online pharmacy that tests "medications and healthcare products to ensure their safety, quality, and consistency." (Id. at ¶ 65.) Valisure is accredited by the International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238) and is registered with the Drug Enforcement Administration (License # RV0484814). (Id. at ¶¶ 65, 66.) On March 5, 2024, Valisure filed a citizen petition with the FDA, requesting a recall and suspension of sales of BPO from the U.S. market. (Id. at ¶ 64; see id. at ¶ 67; ECF No. 82.)[2] In layman's terms, Valisure reported that it had tested and detected high levels of benzene in specific batches of BPO products, including the Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10% BPO Acne Cleansing Bar. (ECF No. 82, p. 5;[3] ECF No. 78, ¶ 68-70, 73.) More specifically, Valisure stated that "current evidence suggests that on-market BPO products could produce substantial amounts of benzene when stored at above-ambient

[2] Plaintiffs have unambiguously incorporated Valisure's citizen petition into the second amended complaint. (See ECF No. 78, ¶¶ 64-74.) Alongside its motion to dismiss, Walgreens has moved for judicial notice of Valisure's citizen petition. (ECF No. 82.) "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (cleaned up). Because the citizen petition is a filing with a government agency, and because Plaintiff's claims necessarily rely on the findings detailed therein, the Court incorporates the citizen petition into the first amended complaint. In light of this, the Court will, where appropriate, cite to the citizen petition for precision of language.

[3] Walgreens' exhibit of the Valisure study has a superimposed heading, obscuring the page number at times. Therefore, the Court will cite to the actual PDF page number of the document.

temperatures, specifically 37°C (98.6°F), 50°C (122°F) and 70°C (158°F)." (ECF No. 82, p. 5.) Moreover, Valisure also detected the substantial production of benzene "emanating externally into the air surrounding an unopened benzol peroxide product," which implicates possible inhalation exposure. (Id. at p. 7.) Valisure observed that the problem with benzene in BPO products is seemingly due to the "inherent instability of the benzol peroxide molecule that breaks down and forms benzene." (Id. at p. 12) (emphasis omitted) (see ECF No. 78, ¶ 74.)

The citizen petition acknowledged the most recent guidance from the FDA, which in 2011 determined that "that benzoyl peroxide [2.5% to 10%] can be adequately labeled to minimize risks while delivering effective acne treatment." (Id. at p. 7) (brackets in original). Meanwhile prescription-strength BPO products require a warning that: "[t]he role of benzoyl peroxide as a tumor promoter has been well established in several animal species. However, the significance of this finding in humans is unknown." (Id. at p. 7.)

Valisure tested 66 different BPO products, both prescription and OTC, including two products from Walgreens, incubating the products at 122 degrees Fahrenheit for 18 days. (Id. at pp. 19-22; see ECF No. 78, ¶ 71.) Results demonstrated that there was a "substantial instability of BPO and its propensity to form concerningly high levels of benzene in only 18 days." (Id. at p. 22.) Valisure noted that 122 degrees Fahrenheit is a reasonable temperature to test because it is a temperature the products may be exposed to during distribution and because it is an "accepted incubation temperature" used in the pharmaceutical industry. (Id. at pp. 21-22.)[4] In addition, Valisure stated that it observed evidence that BPO product packaging may be porous to benzene, enabling some of the benzene "to escape into the environment or air around the package." (Id. at p. 26.)

Valisure offered a possible future remedy to address BPO instability, suggesting the creation of reformulations of BPO-containing acre treatment products. (Id. at p. 29.) Nonetheless, the citizen petition seeks, among other relief, "to have the Commissioner and FDA request recalls and a suspension of sales for products containing the active pharmaceutical

[4] Similar findings were made when Valisure tested certain products, incubating them at 158 degrees Fahrenheit. (ECF No. 82, pp. 23-25.)

ingredient benzoyl peroxide, consistent with FDA's mandate to ensure the safety of prescription and over the counter the drugs in the United States." (Id. at p. 33.)

The FDA has recognized both the risk of benzene resulting from BPO, as well as the potential of the type of degradation that could lead to benzene contamination. (Id. at ¶ 38; see id. at ¶¶ 99, 129.) In December 2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and reminding drug manufacturers they are required to "establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications. This includes testing of raw materials and finished product batches prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity." (Id. at¶ 88) (internal citations omitted). The warning continued: "If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" (Id. at ¶ 88.)

In December 2023, the FDA issued a notice, "FDA alerts drug manufactures to the risk of benzene contamination in certain drugs." (Id. at ¶ 37; see id. at ¶ 89.) As part of the alert, the FDA provided that,

> Manufacturers should not use benzene in the manufacture of drugs. The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance [link to document]) and companion document Q3C Tables and List [link to document]) provide guidance on limited cases where the presence of benzene may be tolerated. Specifically, the ICH Q3C guidance explains that Class 1 solvents such as benzene should not be employed in the manufacture of drug substances, excipients, or drug products because of their unacceptable toxicity. The guidance notes that if benzene use is unavoidable to produce a drug product with a significant therapeutic adv Acne, then its levels should be restricted to 2 parts per million (ppm), unless otherwise justified.
>
> * * *
>
> Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm, consistent with the recommendations described in the ICH Q3C guidance.
>
> * * *
>
> FDA reminds drug manufacturers they are required to establish

> scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 CFR 211.84 ([link to regulation]), 21 CFR 211.160 ([link to regulation])). This Case: 25-3240, 09/11/2025, DktEntry: 18.1, Page 23 of 64 16 includes testing of raw materials and finished product batches (21 CFR 211.165 ([link to regulation])) prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity.
>
> * * *
>
> FDA is also aware of ingredients, such as the antifungal preservative sodium benzoate, that in combination with chemicals, such as antioxidants in a drug formulation, may yield benzene under certain conditions. The formation of benzene from benzoate can lead to an increase in benzene content over a drug's shelf-life' and should be considered when determining the appropriate timing for benzene testing, e.g., testing at release and on stability (21 CFR 211.165, 211.166), and establishment of an appropriate expiration date (21 CFR 211.137).

(Id. at ¶¶ 39, 40 (brackets in original); see id. at ¶¶ 41, 89.)[5]

Plaintiff alleges that the FDCA "expressly incorporates the [United States Pharmacopœia ("USP")] quality standards for medicines and finds that failure to abide by the USP would render a drug adulterated." (Id. at ¶ 44, citing 21 U.S.C. §§ 321(j), 351(b).) "Under USP General Chapter 467, benzene is limited to 2 ppm in pharmaceuticals." (Id. at ¶ 44.) Thus, according to Plaintiffs, the 2 ppm is not only recognized in FDA guidelines, but is incorporated into industry standards that are required under the FDCA." (Id. at ¶ 44; see id. at ¶ 53.)[6] Plaintiffs assert that "[i]t is therefore illegal under federal law to manufacture and distribute drug products in the United States that contain benzene above 2 ppm." (Id. at ¶ 90.) Further still, Plaintiffs allege that "[t]he mere presence of benzene . . . renders the [BPO p]roducts both adulterated and misbranded under the FDCA." (Id. at ¶ 91; see id. at ¶ 128.)

In March 2025, the FDA announced a voluntary recall of certain BPO products due to "elevated levels of benzene." (Id. at ¶ 50; see also id. at ¶¶ 51, 90.) Among the products recalled were Walgreens' Acne Control Cleanser and Tinted Acne Treatment Cream. (Id. at ¶ 52.) This

[5] Plaintiffs also include allegations regarding FDA Health Hazard Evaluations from 2018 and 2021, which are largely duplicative of Plaintiffs' core allegations. (ECF No. 78, ¶¶ 42, 43.)

[6] Plaintiffs also discuss acknowledgements regarding the toxicity of benzene from the National Institute for Occupational Safety and Health and the Environmental Protection Agency. (ECF No. 78, ¶¶ 46-49.)

recall also reminded manufactures that the "FDA requires manufacturers to evaluate and test for possible contaminants in their products to ensure they meet specifications and are free from harmful contamination, including benzene." (Id. at ¶ 52.)

## III.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs in this action are Olabisi Bodunde ("Bodunde") and Monica Bolyard ("Bolyard"). (ECF No. 578, ¶¶ 15, 17.) Bodunde is a resident and Citizen of Chicago, Illinois, and within the past year she purchased multiple Walgreens branded BPO products from Walgreens stores located in Chicago, including the Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10% BPO Acne Cleansing Bar. (Id. at ¶ 15.) Before purchasing, Bodunde reviewed the accompanying labels and disclosures and understood that these were representations and warranties by Walgreens, a retail industry leader, that the products were "properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell." (Id. at ¶¶ 16, 158, 162, 164.) The products did not include a representation that they contained or risked containing benzene, a known carcinogen that has been linked to leukemia and other cancers. (Id. at ¶¶ 1, 16, 162, 165.) Bodunde alleges that she relied on the representations and warranties when deciding whether to purchase BPO products, and "she would not have purchased the [p]roducts from Defendant if she had known that they were not, in fact, properly manufactured, free from defects, safe for their intended use, not adulterated or misbranded, and legal to sell." (Id. at ¶¶ 16, 151, 152, 162.) Bodunde alleges that the BPO products she purchased were in effect "worthless" because "they either contained or risked containing the known carcinogen benzene." (Id. at ¶¶ 16, 169.)

Bolyard is a resident and citizen of Milpitas, California, and within the past two years, she purchased at least one of Walgreen's products, the Walgreens branded Maximum Strength 10% BPO Acne Foaming Wash, from a Walgreens retail store located in Milpitas, California. (Id. at ¶ 17.) Bolyard reviewed the accompanying label and disclosures on the product and understood them as representations and warranties by Walgreens, a retail industry leader, that the product was "properly manufactured, free from defects, safe for its intended use, not adulterated

or misbranded, and legal to sell." (Id. at ¶¶ 18, 151, 152, 158, 162, 164.) The product did not contain a representation that it contained or risked containing benzene. (Id. at ¶ 18, 162, 165.) Bolyard alleges that the BPO product she purchased were in effect "worthless because it either contained or risked containing the known carcinogen benzene." (Id. at ¶¶ 18, 162, 169.)

Both Bodunde and Bolyard allege that they spent money to purchase a BPO product they would not have otherwise purchased, or paid less for, absent Defendant's misconduct. (Id. at ¶¶ 5, 19, 168.) This is so in part because Plaintiffs allege that "[n]o reasonable consumer would have paid any amount for products containing benzene, "much less above the limits set by the FDA." (Id. at ¶ 166.) Plaintiffs allege that their BPO products "either contained benzene or were at significant risk of containing the same." (Id. at ¶ 170.)

Defendant is Walgreens, an American company that was founded in 1901 and specializes in filling prescriptions, health information, and health and wellness products for conditions like acne, eczema, psoriasis, and dry skin. (Id. at ¶ 26.) Walgreens is a corporate entity with its principal place of business and headquarters located in Deerfield, Illinois. (Id. at ¶ 20.)[7] Walgreens sells its products, including BPO-containing acne treatment products, throughout the United States, including Illinois and California. (Id. at ¶¶ 21, 28.) As relevant here, Walgreens sells Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens 10% BPO Acne Cleansing Bar. (Id. at ¶ 28.)

Plaintiffs allege that Walgreen's BPO products "contain levels of benzene well above 2 ppm." (Id. at ¶ 115.) Walgreens' products should not have contained benzene, and Walgreens failed to disclose on the BPO products' labeling or anywhere in its marketing that the BPO products contained or risked containing benzene. (Id. at ¶ 75.) Plaintiffs allege that "[t]he elevated levels of benzene in the BPO Products render the Products adulterated, misbranded, and illegal to sell." (Id. at ¶ 98; see id. at ¶¶ 132, 153.) Moreover, Plaintiffs allege that Walgreens "has violated one or more requirements of the United States Pharmacopœia for BPO, including failing to limit benzene in its BPO Products to a maximum of 2 ppm." (Id. at ¶ 112.) "Whether

---

[7] In 2014, Walgreens bought the 55% stake in Alliance Boots that it did not already own, and Walgreens became a subsidiary of the newly created company, Walgreens Boots Alliance, Inc. (ECF No. 78, ¶ 27.)

during the manufacturing or holding process, the Products should not have become adulterated with elevated levels of benzene." (Id. at ¶ 113.) "The presence of benzene above 2 ppm—which, upon information and belief, resulted from Defendant's failure to comply with cGMPs—renders the Products both adulterated and misbranded under the FDCA." (Id. at ¶ 113.) This also means that the BPO products did not conform to the relevant final monograph. (Id. at ¶ 117, citing 21 C.F.R. § 330.10(b); see id. at ¶ 122.) Walgreens is a large, sophisticated corporation of pharmaceutical drugs, and knew or should have known the risk of benzene being present in the BPO products. (Id. at ¶ 144; see id. at ¶ 145.) Walgreens sold and continues to sell its BPO products despite its knowledge. (Id. at ¶ 147; see id. at ¶ 161.)

According to Plaintiffs, Walgreens also "made a partial representation, by disclosing some of the ingredients within the Products, but by omitting the presence of benzene." (Id. at ¶ 76; see id. at ¶¶ 100, 130, 148, 159.) This would lead a reasonable consumer to assume that Walgreens disclosed all material ingredients in the BPO products. (Id. at ¶ 76; see id. at ¶ 160.) "[T]he misrepresentation of the ingredients in the Products, and the omission of the risk of the Products containing benzene, directly relates to the safety of the Products." (Id. at ¶ 77; see id. at ¶ 102, 118, 130, 149.)

Plaintiffs allege that any reasonable consumer would find the presence of benzene material in a drug product. (Id. at ¶ 78; see id. at ¶ 150.) Plaintiffs assert that had the presence of benzene been tested and/or disclosed by Walgreens, the BPO products would not have likely been on the shelves. (Id. at ¶¶ 78, 154; see id. at ¶ 115, 120.) Thus, Plaintiffs would not have purchased the BPO products had the truth of the benzene within the BPO products been known or, at least, paid less for the products. (Id. at ¶¶ 78, 101.) Relatedly, Plaintiff allege that "[c]onsumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale." (Id. at ¶ 163.)

Furthermore, Plaintiffs assert that because Walgreens' BPO products contain elevated levels of benzene, the BPO products "(1) consist of a filthy, putrid, and/or decomposed substance, (2) have been prepared, packed, or held under unsanitary conditions or whereby it has been contaminated with benzene and rendered injurious to health, and/or (3) have a purity or

qualify that falls below that which it purports or is represented to possess." (Id. at ¶ 96.) As a result, it was illegal for Walgreens to distribute any of its BPO products; in addition, the BPO products were worthless and "dangerous to health." (Id. at ¶¶ 96, 98; see id. at ¶¶ 118, 128, 155.)

According to Plaintiffs, "[h]ad the manufacturing inputs, manufacturing, and holding process been conducted within acceptable temperatures, as required by the cGMP regulations cited above, it is unlikely that any benzene would be present in the Products." (Id. at ¶ 113.) "Plaintiffs believe that it was the manufacturing and holding of the Products at unacceptable temperatures that causes the benzene contamination and/or any instability in the Products." (Id. at ¶ 113.) Walgreens allegedly did not ensure that the BPO products were held at the correct temperatures during transit from the BPO manufacturers to Walgreens nor from Walgreens to retailers. (Id. at ¶ 113; see id. at ¶ 114.) Additionally, "had the benzene contamination been from improper inputs, failure to clean, maintain, and sanitize equipment, or failure to establish control manufacturing and holding procedures, it still would be a violation of the cGMP." (Id. at ¶ 113.) Walgreens also could have avoided any potential for elevated benzene contamination in the BPO products by changing the manufacturing process, and the BPO products could have been sold with undetectable or extremely low levels of benzene in them. (Id. at ¶ 97.) Plaintiffs hypothesize that "if BPO is inherently stable as a pure, crystalline powder, a reformulated product that focuses on substantially reducing or entirely preventing the degradation of BPO into benzene could potentially be developed." (Id. at ¶¶ 97, 127, 128, 140.)

Plaintiffs also allege that Walgreens "has a duty" to "ensure" that its BPO products "did not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the Products into the stream of commerce for consumers to use on their bodies." (Id. at ¶¶ 102, 119, 131.) In addition, Plaintiffs allege that Walgreens knew or should have known that the BPO products were adulterated with benzene or would become adulterated with benzene. (Id. at ¶¶ 116, 121, 156.) Plaintiffs allege that "[Walgreens] did not test its BPO Products for the presence of benzene, in violation of federal and state law." (Id. at ¶¶ 119, 146.)

On March 26, 2024, Plaintiff Bodunde commenced this action (ECF No. 1), and, following litigation not relevant here, on October 14, 2024, an amended complaint was filed by

Plaintiffs Bodunde and Bolyard. (ECF No. 50.) Following the assigned District Judge adopting this Court's findings and recommendations recommending that Plaintiffs' first amended complaint be dismissed in its entirety (ECF No. 69, 77), on January 14, 2026, Plaintiffs filed their second amended complaint—the operative complaint. (ECF No. 78.)

Plaintiffs bring the following claims against Walgreens:

> 1) violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1, et seq.;
>
> 2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.;
>
> 3) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.;
>
> 4) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq.;
>
> 5) unjust enrichment, under Illinois law;
>
> 6) breach of implied warranty of merchantability, under Illinois law; and
>
> 7) violation of state consumer fraud acts.

(ECF No. 78, pp. 53-66.) For relief, Plaintiffs pray for an order certifying a proposed class; an order declaring Walgreens' conduct violates the laws outline in the causes of action; an order finding in favor of Plaintiffs' claims; compensatory, statutory, and punitive damages; pre- and post-judgment interest; an order of restitution "and all other forms of equitable monetary relief;" injunctive relief; an order awarding Plaintiffs their reasonable attorneys' fees and costs. (Id. at p. 67.)

On February 17, 2026, Walgreens moved to dismiss the action for lack of standing and failure to state a claim, and the District Judge referred the motion to the undersigned for the preparation of findings and recommendations. (ECF Nos. 84, 85.) The motion has been fully briefed (ECF Nos. 89, 90), and on April 29, 2026, the Court held a hearing on the matter. (ECF No. 92.)

Subsequently, Walgreens filed two notices of supplemental authority. (ECF Nos. 94, 95.) Under the Court's Local Rules, a notice of supplemental authority is warranted without prior

Court approval and "may contain a citation to the new authority but may not contain additional argument on the motion." L.R. 230(m)(2). These filings comply with this Rule (ECF Nos. 94, 95), which the Court will address in its analysis below.

## IV.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if a plaintiff lacks Article III standing to bring suit. Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011). The standing doctrine is derived from limitation of Article III on the judicial power of federal courts to hear only "actual cases or controversies." Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (internal quotation marks omitted). "The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id. at 338. Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021). "The irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338 (cleaned up), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). A plaintiff must show that the injury was "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks omitted).

The party invoking federal jurisdiction bears the burden of demonstrating standing. TransUnion, 594 U.S. at 430-31. A jurisdictional challenge under Rule 12(b)(1) may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial challenge "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Id. The "'general rule' for Rule 12(b)(1) motions challenging subject-matter jurisdiction is to take allegations 'as true unless denied or controverted by the movant.'" Federal Bureau of Investigation v. Fikre, 601 U.S. 234, 237 n.1 (2024), quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004). A factual

challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone, 373 F.3d at 1039. Generally, in resolving a factual attack, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." Id. (citations omitted). However, the Ninth Circuit recently clarified that "when jurisdictional issues are 'intertwined with an element of the merits of the plaintiff's claim,' the court must treat the motion like a motion for summary judgment and 'leave the resolution of material factual disputes to the trier of fact.'" Bowen v. Energizer Holdings, Inc., 118 F.4th 1134, 1143 (9th Cir. 2024), quoting Leite v. Crane Co., 749 F.3d 1117, 1122 (9th Cir. 2014).

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citation omitted). But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted. In re Gilead Scis. Sec. Litig., 536 F.3d 1049,

1055 (9th Cir. 2008) (citation omitted). "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." Saloojas, Inc. v. Aetna Health of Cal., Inc., 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

## V.

## DISCUSSION AND ANALYSIS

Walgreens begins by arguing that the operative complaint fails to meet the Rule 9(b) pleading standard. (ECF No. 84, pp. 14-18.) Second, Walgreens reiterates that, in its view, Plaintiff's theory that Walgreens failed to warn about any alleged benzene is expressly and impliedly preempted (or in the alternative, the FDA has primary jurisdiction). (Id. at pp. 18-19.) Third, Walgreens argues that Plaintiffs do not have standing to assert claims relating to products they did not purchase. (Id. at p. 20.) Fourth, Walgreens asserts that Plaintiffs have no cognizable basis for injunctive relief. (Id. at pp. 20-21.) Fifth, and finally, Walgreens contends that Plaintiffs' request for equitable relief fails because they allege adequate legal remedies. (Id. at pp. 21-23.)

Plaintiffs oppose, beginning by arguing that their claims are not preempted nor is invoking primary jurisdiction appropriate in this case. (ECF No. 89, pp. 1-7.) Thereafter, Plaintiffs argue that they have standing to assert claims for all relevant BPO products. (Id. at pp. 11-12.) Plaintiffs likewise argue that they have standing to pursue injunctive relief. (Id. at pp. 12-13.) Last, Plaintiffs argue that they pleaded their equitable relief in the alternative. (Id. at p. 13.)

The Court takes the parties arguments in the order the Court finds most logical.

### A. Judicial Notice

Walgreens has moved for judicial notice of (1) the Valisure Petition and (2) The United States Pharmacopeial Convention, General Chapter ⟨467⟩ Residual Solvents (2008). (ECF Nos. 82, 91.)

"As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), quoting Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994). Doing so would convert a

motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may take judicial notice of a fact not subject to reasonable dispute, either because the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Courts may also take judicial notice of undisputed matters of public record, Lee, 250 F.3d at 689, including documents filed in federal or state courts. Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012). As relevant here, "[a]s a general matter, websites and their contents may be proper subjects for judicial notice." Jones v. Tonal Systems, Inc., 751 F. Supp. 3d 1025, 1031 (S.D. Cal. 2024). This is especially true where "allegations in the complaint necessarily rely [on the documents], even if not expressly referenced in the complained, provided that the authenticity of those documents are not in dispute." Id.

Furthermore, "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee, 250 F.3d at 688 (cleaned up).

The Court finds judicial notice is appropriate. Specifically, the documents are the Valisure Petition and a chapter from the USP. Plaintiffs have not objected to the Walgreens' requests for judicial notice. Thus, the Court GRANTS the requests for judicial notice. (Nos. 82, 91.)

**B. Preemption**

Walgreens renews its previous preemption argument, which the Court agreed with, that "to the extent Plaintiff's claims are based on allegations that Walgreens should have warned about the presence of benzene on Walgreen's BPO product labels, that theory is expressly preempted because it would be an 'addition' not required by federal law." (ECF No. 84, pp. 10-11, quoting ECF No. 69, at pp. 19-20.) In opposition, Plaintiffs again argue that their claims are not 'failure to warn' claims but claims that violate state law consumer protection statutes. (ECF No. 89, pp. 1-2.) This time the Court again with Plaintiffs.

A couple of preliminaries. Plaintiffs have shifted the pleadings from only a theory of omission to framing the issues as misrepresentations, failure to disclose, and making partial representations (See ECF No. 78, ¶¶ 5, 14, 75, 76.) In other words, Plaintiffs argue that the BPO products should not have made it to the market in the first instance. (ECF No. 89, p. 2.) It is with this understanding that the Court reconsiders the issue of preemption.

**1. Preemption Legal Principles**

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). Preemption comes in multiple forms—express, field, and conflict preemption—but the purpose of Congress is "the ultimate touchstone" for all of them. Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1003 (9th Cir. 2013), quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

As relevant here, to ensure uniformity in the regulation of OTC drugs like Walgreens' BPO products, the FDCA contains a broad express preemption provision, which provides that no state "may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. § 379r(a). The statute defines "requirement" to include "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug." 21 U.S.C. § 379r(c)(2).

OTC acne drug products, including Walgreens' products, are governed by a comprehensive set of FDA regulations called a monograph, which includes certain labeling requirements. 21 C.F.R. §§ 330.1, 330.5, 330.10; 333.350. The Acne Monograph expressly permits BPO to be an active ingredient in these products in an amount from 2.5 to 10 percent. 21 C.F.R. § 333.310(a). Section 333.350 provides detailed instructions for labeling covered products, including specific warnings and directions that must be included for products containing BPO. 21 C.F.R. § 333.350(c)(4), (d)(2). The regulations provide that an OTC acne drug product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions" in the monograph and "each general condition" in 21 C.F.R. § 330.1. Id. at § 333.301. In turn, Section 330.1 specifies that OTC drugs must meet the conditions described therein and must be "labeled in

compliance with chapter V" of the FDCA and "the format and content requirements in § 201.66." 21 C.F.R. § 330.1(c)(1). Chapter V of the FDCA prohibits the sale of adulterated or misbranded drugs. 21 U.S.C. §§ 331(a), 351, 352.

Consistent with Congress's intent to promote uniform drug regulation, "state law claims regarding the labeling or packaging of [OTC drugs] that are not identical to the [FDCA] are expressly preempted." Henning v. Luxury Brand Partners, LLC, No. 22-cv-07011-TLT, 2023 WL3555998, at *5 (N.D. Cal., May 11, 2023); see Gisvold v. Merck & Co., 62 F. Supp. 3d 1198, 1203 (S.D. Cal. 2014). However, Section 379r does not preempt claims under state law that impose identical or "parallel" requirements to FDA regulations. Riegel v. Medtronic, 552 U.S. 312, 330 (2008); see Ebrahimi v. Mentor Worldwide LLC, 804 Fed. Appx. 871, 872 (9th Cir. 2020) (mem.). As recognized by the Ninth Circuit, the Supreme Court of the United States in "Buckman . . . left the door open to state-law claims 'parallel' to federal requirements." McClellan v. I-Flow Corp., 776 F.3d 1035, 1040 (9th Cir. 2015); see Davidson v. Sprout Foods, Inc., 106 F.4th 842, 849 (9th Cir. 2024), discussing Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2021). To avoid preemption, "[t]he plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted [ ]) but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)." Perez v. Nidek Co., Ltd., 711 F.3d 1109, 1120 (9th Cir. 2013) (citation omitted) (emphasis in original).

The upshot of the regulations and the Acne Monograph, described above, is that a drug that complies with *all* monograph requirements is not misbranded. 21 C.F.R. § 330.10(a)(1) ("The Commissioner shall . . . evaluate the safety and effectiveness of OTC drugs, to review OTC drug labeling, and to advise him on the promulgation of monographs establishing conditions under which OTC drugs are generally recognized as safe and effective and not misbranded"). The Acne Monograph lists BPO as a permitted active ingredient. U.S. Food & Drug Admin., Over-the-Counter (OTC) Monograph M006: Topical Acne Drug Products for Over-the-Counter Human Use; see also 21 C.F.R. § 333.310(a); 21 C.F.R. § 333.350(c)(4). Some courts have observed that the FDA's Monograph "allows [topical acne drugs] to be formulated with the active ingredient [BPO] and does not require disclosure that [BPO] may degrade into [benzene]." Williams v. Galderma

Laboratories, L.P., No. 24 CV 2222, 2024 WL 4213220, at *3 (N.D. Ill. Sept. 17, 2024), quoting Truss v. Bayer Healthcare Pharms. Inc., No. 21 CV 9845 (VB), 2022 WL 16951538, at *4 (S.D.N.Y. Nov. 15, 2022); see Mut. Pharm. Co. v. Bartlett, 570 U.S. 472, 488-90 (2013). That said, as mentioned above, the monograph itself requires that the product follow "each general condition" in 21 C.F.R. § 330.1.

**2. Preemption and Misbranding**

The Court begins with the parties arguments regarding misbranding. Essentially, this issue boils down to two sides. Walgreens believes that by complying with the Acne Monograph, it has no other duty under the FDCA and requiring that it do anything more in terms of labeling would be preempted under 21 U.S.C. § 379r. (ECF No. 84, pp. 10-11.) Plaintiffs assert that the Acne Monograph itself requires Walgreens to comply with other general labeling requirements of the FDCA. (ECF No. 89, p. 3.) Upon consideration of the parties' refined arguments and authority, the Court is persuaded that although the Acne Monograph contains certain requirements, Walgreens' BPO Products are also subject to Chapter V of the FDCA, which covers general labeling requirements. In order to arrive at this conclusion, the Court takes a tour into the interlocking statutory framework.

To begin, the Court quotes, in relevant part, the Acne Monograph:

> An over-the-counter acne drug product in a form suitable for topical application is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart **and** each general condition established in § 330.1 of this chapter.

21 C.F.R. § 333.301(a) (emphasis added).

In turn, § 330.1 provides

> An over-the-counter (OTC) drug listed in this subchapter is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in this part and each of the conditions contained in any applicable monograph. Any product which fails to conform to each of the conditions contained in this part and in an applicable monograph is liable to regulatory action.
>
> * * *
>
> The product is labeled in compliance with chapter V of the Federal

> Food, Drug, and Cosmetic Act (the act) and subchapter C et seq. of this chapter, including the format and content requirements in § 201.66 of this chapter. An OTC drug product that is not in compliance with chapter V and subchapter C, including § 201.66 of this chapter, is subject to regulatory action.

21 C.F.R. § 330.1(c)(1).

And under Chapter V, "[a] drug or device shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular" or "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. §§ 352(a)(1), (j).

With the foregoing laid out, the Court finds it plain that compliance with the Acne Monograph includes meeting "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Moreover, § 330.1(c)(1) expressly incorporates Chapter V of the FDCA, which covers general misbranding. Thus, with this understanding, it does not appear that a misbranding theory, based on Chapter V of the FDCA, is expressly preempted by the Acne Monograph. See Rutledge v. Walgreen Co., ___ F.4th ___, 2026 WL 2015284 (2d Cir. July 13, 2026) (discussing that in context of Internal Analgesic, Antipyretic, and Antirheumatic Drug Products monograph that incorporates § 330.1, "The IAAA monograph sets forth various labeling requirements. . . . The monograph does not, however, expressly prohibit additional warnings not specified therein.").

Walgreens only real response to this is citing to the preemption statute itself, which states in relevant part:

> . . . no State or political subdivision of a State may establish or continue in effect any requirement— . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter [*i.e.*, the FDCA]."

21 U.S.C. § 379r(a)(2).

Walgreens also cites to subsection (c)(2), which states:

> For purposes of subsection (a), a requirement that relates to the regulation of a drug shall be deemed to include any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug.

Id. at § 379r(c)(2).

This appears to get Walgreens nowhere because the Acne Monograph itself requires compliance with each general condition established in § 330.1, which in turn incorporates Chapter V labeling requirements. Moreover, subsection (c)(2) merely includes further definition of what a regulation of a drug means—namely, requirements relating to public information or any form of public communication relating to a warning on any kind of drug.

Indeed, two recent district courts to examine this issue have sided with Plaintiffs' position here. In In re Target Corporation BPO Sales and Marketing Litigation, the district court noted that various district courts had held that a misbranding theory of liability was preempted by § 379r but that "most courts to have addressed this issue stop[ped] with the monograph." No. 24-cv-1323 (ECT/JFD), 2026 WL 145824, at *10 (D. Minn. Jan. 20, 2026). In reviewing the cases cited by the parties, including this Court's previous findings and recommendations, the In re Target court observed that in the caselaw

> none addresses the regulations' additional requirement that, to be 'not misbranded,' an OTC product's labeling must also comply with 21 C.F.R. § 330.1, including Chapter V's more general proscription against 'false or misleading' labeling, 21 U.S.C. § 352(a)(1). And no reason or explanation has been identified to show why the monograph might trump § 352(a)(1)'s more general requirement.

Id.

The Court agrees with In re Target that a theory of misbranding, pursuant to state-law, *may* sufficiently parallel the FDCA's requirements under Chapter V. Plaintiffs allege that benzene is present in Walgreens' BPO products and that benzene causes adverse health consequences. Accepting those allegations as true, the Acne Monograph/FDCA plausibly would have required Walgreens to disclose the presence of benzene on the BPO products' labeling.

The In re Target court thoughtfully discussed the Acne Monograph, § 379r, and related provision of the FDCA in coming to its conclusion. 2026 WL 145824, at *9-*10. And, as discussed above, a requirement of the Acne Monograph (and the FDCA) is that an OTC acne product must also comply with "general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Thus, the general labeling requirements of Chapter V do not seem to be "different or in addition to" federal law.

Next, in Mitchell v. Kenvue, Inc., the district court noted the divide between other courts and the approach taken in In re Target. No. 24-cv-4109 (GC) (JBD), 2026 WL 509400, at*13 (D.N.J. Feb. 24, 2026). As the Court analyzed above, the Mitchell court observed that "the Acne Monograph itself also recognizes that its labeling requirements are subject to Chapter V of the FDCA." Id., citing 21 C.F.R. §§ 333.301(a), 333.350(b). Moreover, the Mitchell court also noted that "[a]lthough Plaintiffs' Chapter V misbranding theory is not preempted, Plaintiffs must still allege that their claims are cognizable under parallel state law," which the Court finds to be true here as well. Id. at *14.

Following taking the matter under submission, Walgreens alerted the Court to the recent Supreme Court decision Monsanto Co. v. Durnell, 609 U.S. ___, 146 S. Ct. 2001 (2026). (ECF No. 94.) The Court has reviewed the case and finds that it is not apposite to the case at bar. Critically, Durnell did not involve the interplay between a monograph and preemption statute. Rather, in Durnell—a case involving pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act—the issue before the Court involved only a preemption statute. 146 S. Ct. at 2005. As relevant here, the preemption statute in that case provided the following:

> **(a) In general**
>
> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
>
> **(b) Uniformity**
>
> Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v(a), (b).

Similar here, the plaintiff in Durnell brought a failure to warn claim arguing that the defendant's product could be carcinogenic. Id. at 2006. Essentially, the Court observed that the plaintiff's state tort claim would require the defendant to add a cancer warning to its product's label even though federal law required the defendant to use the EPA-approved label without a cancer warning. Id. Because the plaintiff's state tort claim would impose a pesticide labeling

requirement "in addition to or different from" the label required by EPA, the Supreme Court held that this claim was expressly preempted. Id.

As should be apparent, subsection (b) of § 136v does not contain a requirement like the Acne Monograph that each product be also in compliance with "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Furthermore, the relevant preemption statute here does not include explicit preemption of labeling or packing requirements *in toto*. 21 U.S.C. § 379r. In addition to this critical distinction in statutory language, the Supreme Court also noted in Durnell that there is an entirely different process regarding labeling in cases involving pesticide—namely, the EPA must approve a pesticide's label. Durnell, 146 S. Ct. at 2010. Moreover "[a]fter EPA approves a pesticide's label at registration, manufacturers are legally *required* to use that label—unless and until EPA approves or requires a label change and amends the pesticide's registration." Id. (emphasis in original). The Court thus summarized that "federal law require[d] [the defendant] to sell [the product] with the label that EPA approved at the initial registration and that EPA has subsequently re-approved on multiple occasions—that is, the label without a cancer warning." Id. at 2011. Though a case involving the discussion and application of preemption principles, Durnell is not persuasive.

Walgreens also directs the Court to Brower v. Colgate-Palmolive Co., a class action involving allegations that the defendant's toothpaste contained heavy metals. No. 25-cv-03348 (JPO), 2026 WL 1831253, at *1 (S.D.N.Y. June 25, 2026). That case too involved the preemption statute 21 U.S.C. § 379r as well as a monograph that covered anticaries. Id. at *4. Though the court cited Durnell favorably in its recitation of preemption, it did not necessarily incorporate the reasoning whole cloth into its analysis. See id. at *3. Critically, the Brower court did not address the issue of the anticaries monograph incorporating § 330.1, just like the Acne Monograph does. In fact, the anticaries monograph is nearly identical to the Acne Monograph in this respect:

> An over-the-counter anticaries drug product in a form suitable for topical administration to the teeth is generally recognized as safe and effective and is not misbranded if it meets each condition in this part **and** each general condition established in § 330.1 of this chapter.

21 C.F.R. § 355.1 (emphasis added). Because the Brower court did not address this issue, the

Court finds it unpersuasive.

Not done yet, Walgreens filed another notice of supplemental authority, directing the Court to Yousefzadeh v. Johnson & Johnson Consumer Inc., ___ F.4th ___, 2026 WL 2192415 (2d Cir. July 30, 2026). (ECF No. 95.) In Yousefzadeh, the plaintiffs alleged that certain nasal decongestants contained, and were sold with, an "active ingredient" that did not in fact decongest. Id. at *1. Thus, the plaintiffs brought misbranding claims that relied on an assertion that the nasal decongestants could not be labeled as such. Id. The Second Circuit disagreed. Id. at *9. The court observed that "an oral PE product cannot be considered 'misbranded' by virtue of its compliance with the requirements established in 21 C.F.R. § 330.1 and the monograph – including the condition that the product's label indicate its approved use as a nasal decongestant." Id. Unsurprisingly, the court determined that "[b]ecause Defendant Manufacturers' products fulfill these requirements, their drugs are not misbranded, as that term is used in the FDCA, and do not violate the misbranding provision." Id.

However, the plaintiffs' claims in Yousefzadeh are materially different from the case at bar. Here, by contrast, Plaintiffs do not seek to have Walgreens' BPO Products change their labeling that their products are OTC acne drug products. Indeed, Plaintiffs allege that BPO is, at the very least, an acceptable drug in acne prevention. In other words, Plaintiffs would not have Walgreens change its labeling based solely on its use of the BPO. Rather, Plaintiffs' claims stem from allegations that the BPO at issue, in these products, degrades into benzene. Thus, if true, Plaintiffs would have Walgreens include a label about benzene degradation on its current formulations (or otherwise change it formulations to be more stable). Thus, the Court finds Yousefzadeh to be factually distinguishable and therefore not persuasive.

In light of the foregoing, the Court finds that Plaintiffs' misbranding claims, under the circumstances, are not categorically preempted.

**3. Preemption and Theory of Adulteration: 351(b) (and the USP)**

Walgreens initially did not raise a direct argument in its motion to dismiss regarding Plaintiffs' theory of adulteration that relies on the USP. In their opposition, Plaintiffs outlined their position. (ECF No. 89, pp. 3-4.) And Walgreens responded to this in its reply and by later

moving for judicial notice of the USP. (ECF No. 90, pp. 3-4; ECF No. 91.) The Court notes that this issue was discussed fully at the hearing. In light of the foregoing, the Court addresses the issue fully in this order.

The Court begins with Plaintiffs' theory of adulteration based on § 351(b), which provides that a drug is adulterated "[i]f it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. . . ." 21 U.S.C. § 351(b). Plaintiffs assert that the USP is an official compendium and therefore, the requirements in the USP are 'incorporated' into the FDCA. In order to understand this theory, the Court outlines the pathway below.

Title 21 U.S.C. § 321(j) provides:

> The term 'official compendium' means the official United States Pharmacopœia, official Homœopathic Pharmacopœia of the United States, official National Formulary, or any supplement to any of them.

Of course, the USP, or United States Pharmacopœia, is explicitly listed in § 321(j). Plaintiffs then cite to USP General Notice 5.60.20, which provides:

> All USP and NF articles are subject to relevant control of residual solvents, even when no test is specified in the individual monograph. If solvents are used during production, they must be of suitable quality. In addition, the toxicity and residual level of each solvent shall be taken into consideration, and the solvents limited according to the principles defined and the requirements specified in Residual Solvents ⟨467⟩, using the general methods presented therein or other suitable methods.

In turn, USP Chapter ⟨467⟩, Residual Solvents, provides "[f]or pharmacopeial purposes, residual solvents in pharmaceuticals are defined as organic volatile chemicals that are used or produced in the manufacturing of drug substances, excipients, or dietary ingredients, or in the preparation of drug products or dietary supplement products." (2025 USP, p. 2.)[8] USP Chapter ⟨467⟩, Residual Solvents, Table 2, states that benzene is a solvent with a "concentration limit

---

[8] Walgreens moved for judicial notice of the 2008 version of Chapter ⟨467⟩ from the USP. (ECF No. 91.) However, in the related case Navarro v. Walgreens, No. 1:24-cv-00290-JLT-SAB, the Court took judicial notice of the 2025 version of Chapter ⟨467⟩ from the USP. Because these are related cases, and the fact that the 2025 USP is more up to date, the Court *sua sponte* takes judicial notice of the 2025 version of the USP. See Navarro v. Walgreens, No. 1:24-cv-00290-JLT-SAB, ECF No. 57-1, 2025 USP. Hereinafter, the Court will refer to this version of the USP as "2025 USP."

(ppm)" of 2 because it is a "carcinogen." (Id. at p. 5.) In short, Plaintiffs contend that the FDCA incorporates the USP, and the USP includes Chapter ⟨467⟩, which provides a limit of 2 ppm to benzene.

Walgreens disagrees, arguing that USP Chapter ⟨467⟩ is not incorporated into the FDCA and even if it were applicable, it applies only to "residual solvents," which are "organic volatile chemicals that are used or produced in the manufacturing of drug substances." (ECF No. 90, p. 4.) Walgreens offers that benzene is not an intentional ingredient or solvent used in the manufacturing of BPO products, so the 2-ppm limit does not apply here.

This Court previously found that Plaintiffs did not allege any binding regulatory benzene safety threshold, 2 ppm or otherwise, applicable to defendant's BPO products. Plaintiffs have now identified a pathway to incorporate the 2-ppm limit, which the Court must analyze. The Court begins with the language of the USP before returning to the language of the statute.

Regarding the USP, the key language (at first blush) is the "definition" of a residual solvent, which is "organic volatile chemicals that are used or produced in the manufacturing of drug substances . . . ." (2025 USP, p. 2.) The Court notes that there are no allegations that Walgreens used benzene as a solvent in its manufacturing of its BPO products. Next, though nuanced, the Court uses the common definitions of the words "produce" and "manufacturing" and finds that the phrase "produced in the manufacturing" to be "to [have] cause[d] to have existence or to happen"[9] in "the act or process of producing something."[10] This would seem to support Walgreens' position.

Importantly, however, the Court has reviewed a section of USP Chapter ⟨467⟩ that discusses the Classification of Residual Solvents by Risk Assessment. (2025 USP, p. 3.) In that section, it is noted that there are three potential sources of residual solvents in pharmaceutical drug products. As relevant here, the first category, "drug substance or dietary active ingredient," states

---

[9] "Produce." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriamwebster.com/dictionary/produce. (last accessed June 4, 2026).

[10] "Manufacture." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/manufacture. (last accessed June 4, 2026).

that "[p]otential solvent sources include their use or formation during the synthesis or purification of the drug substance; their presence in raw materials or reagents used in their synthesis; or *degradation of the drug substance*." (Id.) (emphasis added). In other words, it appears that USP Chapter ⟨467⟩ explicitly contemplates drug degradation as a source of residual solvents. Therefore, there is an ambiguity between USP Chapter ⟨467⟩'s apparent definition of "residual solvents" and later discussions explicitly including degradation. On a motion to dismiss, the Court must view the facts in the light best for the nonmovant, and therefore, the Court finds that USP Chapter ⟨467⟩ arguably covers degradation of the drug substances.

With this finding, the Court is required to address Walgreens's argument that even assuming the USP Chapter ⟨467⟩ creates a 2-ppm limitation in the degradation of BPO, § 351(b) does not generally incorporate the USP generally as Plaintiffs have posited. In support, Walgreens contends that § 351(b) provides that a drug is adulterated if it is represented as a drug recognized in an official compendium, but its "strength differs from, or its quality or purity falls below, the standard set forth in such compendium." 21 U.S.C. § 351(b). Therefore, Walgreens contends that § 351(b) is concerned with drugs whose strength, quality, or purity are misrepresented—not with drugs that allegedly contain a contaminant.

Though a close call, the Court is persuaded by Plaintiffs' position. The Court takes Walgreens' position that § 351(b) is concerned about the drug strength or quality being misrepresented. However, the Court cannot ignore that the term "purity" is also used. Thus, condensing the plain words of the statute: "a drug is adulterated . . . if . . . its purity falls below, the standard set forth in [the USP]." 21 U.S.C. § 351(b). Thus, it appears that if an applicable drug falls below the purity requirements of the USP, the statute states that such drug is adulterated.

Plaintiffs have made such allegations, and therefore, the Court is persuaded that this theory of adulteration is not preempted.

**C. Primary Jurisdiction Doctrine**

In renewing the preemption discussion, Walgreens wishes to again press its argument that notwithstanding the Court's determination regarding preemption, this matter should be dismissed "because the questions presented in this case are within the primary jurisdiction of FDA." (ECF

No. 84, p. 11.) Plaintiffs oppose, arguing that the primary jurisdiction doctrine is a "permissive doctrine" that is inapplicable to the case at bar. (ECF No. 89, pp. 5-7.) The Court agrees with Plaintiffs.

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency. Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008). "A court's invocation of the doctrine does not indicate that it lacks jurisdiction." Id., citing Reiter v. Cooper, 507 U.S. 258, 268-69 (1993). Rather, the doctrine is a "prudential" one, "under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." Id., citing Syntek Semiconductor Co., Ltd. v. Microchip Technology, Inc., 307 F.3d 775, 780 (9th Cir. 2002).

"Primary jurisdiction applies in a limited set of circumstances." Id. For example, "the doctrine is not designed to 'secure expert advice' from agencies 'every time a court is presented with an issue conceivably within the agency's ambit.'" Id., quoting Brown v. MCI WorldCom Network Servs., 277 F.3d 1166, 1172 (9th Cir. 2002); see also Reid v. Johnson & Johnson, 780 F.3d 952, 966 (9th Cir. 2015). Rather, "it is to be used only if a claim 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, . . . and if 'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.'" Id., quoting Brown, 277 F.3d at 1172, and United States v. General Dynamics Crop., 828 F.2d 1356, 1362 (9th Cir. 1987).

When a district court determines that primary jurisdiction applies, it enables a "referral" of the issue to the relevant agency. Id. at 1115, quoting Reiter v. Cooper, 507 U.S. 258, 268 (1993). Thus, "this means that the court either stays proceedings or dismisses the case without prejudice, so that the parties may seek an administrative ruling." Id., citing Syntek, 307 F.3d at 782 n.3. "'[T]here is no formal transfer mechanism between the courts and the agency'; rather, the parties are responsible for initiating administrative proceedings themselves.'" Id. (brackets in original), quoting Syntek, 307 F.3d at 782 n.3.

The Ninth Circuit has "held that the doctrine applies in cases where there is: '(1)[a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." Id., quoting Syntek, 307 F.3d at 781 (brackets in original). That said, "[t]he 'deciding factor' in determining whether the primary jurisdiction doctrine should apply is 'efficiency.'" Reid, 780 F.3d at 967, quoting Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1165 (9th Cir. 2007). In considering these factors, the Ninth Circuit has explained that "the primary jurisdiction doctrine is designed to protect agencies possessing 'quasi-legislative powers' and that are 'actively involved in the administration of regulatory statutes.'" Id., quoting General Dynamics, 828 F.2d at 1365.

Here, the Court finds that the FDA is an agency with quasi-legislative powers and is actively involved in the administration of regulatory statutes, namely the FDCA and the OTC Acne Monograph. From the outset, the parties frame the issue needing to be resolved differently. Plaintiffs argue that there is no need to even involve the expertise of the FDA because, in Plaintiffs' view, the FDA has already expressly created a 2-ppm limit that Plaintiffs are merely aiming to enforce under the theory that Walgreens has been negligent in its manufacturing. Walgreens frames the issue as "whether BPO is a safe ingredient to include in acne products with the FDA-mandated monograph warnings . . . ." (ECF No. 90, p. 7.)

The Court is not persuaded by Walgreens. Whether and to what extent the 2-ppm limit is incorporated into the FDCA is a legal question within the competency of the Court. Furthermore, the Court is not persuaded that staying this action will accomplish any efficiency. Though the Valisure citizen petition has been filed, Walgreens have offered nothing in the way that the Petition would be addressed in the near future or that the exact issues in this case would necessarily be ruled on. The legal and factual issues this case presents may be complex, but they are not beyond a court's conventional experience.

For these reasons, the Court finds that Plaintiffs have the better argument here. The Court will recommend denying Walgreens' request to stay this matter under the primary

jurisdiction doctrine.

**D. Failure to State a Claim**

The parties appear to agree on one aspect of Plaintiffs' second amended complaint: Plaintiffs bring two theories of benzene contamination. First, Plaintiffs allege that the BPO products they purchased universally contained benzene. Second, Plaintiffs allege that Walgreens failed to comply with cGMPs. The Court will take each theory in turn.

**1. Rule 9(b) Pleading Standard**

In alleging a claim grounded in fraud, "a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). A court may dismiss a claim for failing to satisfy the heightened pleading requirements of Rule 9(b). Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1107 (9th Cir. 2003). Under this heightened pleading standard, a party must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Moore v. Mars Petcare US, Inc., 966 F.3d 1007, 1019 (9th Cir. 2020), quoting Davidson v. Kimberly-Clark, 889 F.3d 956, 964 (9th Cir. 2018). The complaint must contain enough detail to put a defendant on notice of the alleged misconduct so they may "defend against the charge and not just deny that they have done anything wrong." Vess, 317 F.3d at 1106. "[C]laims based on an omission can succeed without the same level of specificity required by a normal fraud claim." Miller v. Ford Motor Co., No. 2:20-cv-01796-TLN-CKD, 620 F. Supp. 3d 1045, 1068 (E.D. Cal. Aug. 10, 2022) (citation and internal quotation marks omitted). When a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of that claim, that claim is said to be "'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b)." Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (discussing in context of CLRA and UCL claims).

**2. Theory of Universal Benzene Contamination**

Walgreens argues that Plaintiffs have failed to make product-specific allegations that the BPO products they purchased in fact contained benzene at any time, notwithstanding Valisure's study. (ECF No. 84, p. 7.) In Walgreens' view, Plaintiffs "simply speculate" that the products

they purchased "either contained or risked containing a known carcinogen benzene." (Id., quoting ECF No. 78, ¶¶ 16, 18.) Plaintiffs first respond arguing that they need not but have alleged universal benzene contamination. (ECF No. 89, p. 7.) Plaintiffs then focus on the Rule 9(b) requirements. (Id. at p. 8.) Finally, Plaintiffs argue that the Valisure study supports their claims and that Walgreens would require Plaintiffs to provide or allege evidence. (Id. at pp. 8-9.)

From the outset, the Court clarifies what appears to be a point of contention that the parties are less than precise about when making their arguments. The Court notes that, at least under the universal benzene contamination theory, Walgreens is not attempting to increase Rule 9(b) pleadings or require Plaintiffs to provide evidence. Rather, Walgreens focuses its arguments on the plausibility of Plaintiffs' claims, in light of their allegations. Indeed, Plaintiffs are aware of this, as they later argue that the Valisure study helps nudge their claims into the realm of plausible. (ECF No. 89, p. 10.) Though these types of arguments may be appropriate in another context, the Court does not find that Walgreens is attempting to require more from the pleading standards.

With that, the Court agrees with Plaintiffs that they meet generally Rule 9(b) pleading standards with the following logic chain: "Plaintiffs each lay out that Defendant (who) deceptively marketed products as legal OTC drugs when they were adulterated because they contained benzene over the FDA limits and failed to comply with cGMP (what and how) which they purchased at Defendant's retail locations (where) during the relevant time periods (when)." (ECF No. 89, p. 10.) Indeed, for this theory, Walgreens does not even seemingly attack any of these components. Rather, the crux of this argument—perhaps the crux of the case—is whether the Valisure study, in combination with Plaintiffs allegations, can raise Plaintiffs' claims beyond the realm of conclusory to the plausible.

Walgreens begins by asserting that Plaintiffs have not alleged that the actual products they purchased contained benzene at any time. (ECF No. 84, p. 7.) Thus, in Walgreens' view, Plaintiffs "allege nothing about testing which would show that the BPO Products in their possession ever contained benzene." (Id.) To support this contention, Walgreens notes that at time Plaintiffs 'speculate' in their complaint that the BPO products they purchased "either

contained or risked containing the known carcinogen benzene." (Id., quoting ECF No. 78, ¶¶ 16, 18.) Furthermore, Walgreens observes that Plaintiffs do not allege the UPC, batch, or lot numbers for their BPO products "to confirm whether those correspond to any of the products tested by Valisure," "[n]or do they allege that they subjected their BPO Products to the temperatures described in the Citizen Petition. " (Id.) Finally, Walgreens argues that even if Plaintiffs had alleged these identified deficiencies, it would not matter because, for the theory of universal benzene contamination, the Valisure study did not detect benzene in all BPO acne products Valisure subject to high temperatures. (Id.) In other words, the Valisure study itself rebuts Plaintiff's theory.

In their briefing, Plaintiffs focus the Court on the Rule 9(b) components pleaded and later, in the section regarding universal benzene contamination, Plaintiffs contend that "[they] do not have to show that all Products had benzene to be adulterated, they just must show that all of the Products were illegal to sell because Defendant failed to comply with cGMP[s]." (ECF No. 89, p. 9.) In other words, "[i]t is Defendant's uniform production process that Plaintiffs claim is deficient." (Id.) Plaintiffs given further nuance to their position stating that, "Plaintiffs are not required to show that every Product is uniformly contaminated with benzene to survive a motion to dismiss. Instead, at this stage of the proceedings, Plaintiffs only need to provide 'defendants with adequate notice to allow them to defend the charge.'" (ECF No. 89, p. 9, quoting Kearns, 567 F.3d at 1125.) Thus, the term 'universal benzene contamination' appears to be a bit of a misnomer.

In support of its position, Walgreens first discusses Howard v. Alchemee, LLC. The Court finds Howard to be persuasive on certain aspects but unhelpful on others. In Howard, the plaintiffs brought similar claims regarding other BPO acne products with the Valisure study as support thereto.[11] 2024 WL 4272931, at * 1. In discussing preemption, the court in Howard observed the same logic undergirding the second amended complaint here:

> Plaintiffs do not allege that Defendants violated state law by introducing into the market a product (Proactiv) that was

[11] Indeed, it is worth observing that multiple attorneys overlap between Howard and the present case.

> contaminated with benzene. While the FAC includes allegations about adulterated drugs, Plaintiffs' claims are for failing to disclose the adulteration or risk thereof (i.e., the risk of benzene in the product). Dkt. No. 45 ¶¶ 305, 317-24, 331, 343, 345, 366, 372. Despite their claims, Plaintiffs argued at the hearing that Defendants are selling an inherently adulterated product—amounting to a criminal act—because BPO degrades into benzene. Not only is that argument inconsistent with the FDA's approval of BPO, it also contradicts the central theory of their FAC (i.e., false advertising for failure to warn) because no additional warning could transform a criminally adulterated drug into a legal, commercial product.

Id. at *9.

That said, as Plaintiffs observe, the quote from above that Walgreens has directed the Court to is in a section discussing preemption, not whether the plaintiffs had stated a claim. See id. Plaintiffs are also correct that Walgreens characterization that Howard stands for the proposition that the Valisure study is not sufficient to support a consumer fraud claim is a stretch. (ECF No. 89, p. 9.) Rather, it is an example where facts, similar but differing from here, coupled with the Valisure study were not enough to survive a motion to dismiss. Plaintiffs last point is that Howard found that the plaintiffs had stated an injury-in-fact; however, this is unhelpful at this juncture because whether a party alleges an injury-in-fact and whether a party states a claim are different analyses. In other words, it is not uncommon for a party to suffer an injury and yet still fail to state claim.

Walgreens also relies on Kouyate v. Harvard Drug Group LLC, where the plaintiffs brought similar claims regarding BPO products. 1:24-cv-06223-GHW, 2025 WL 2773159, at *1 (S.D.N.Y. Sept. 26, 2025). Specifically, Walgreens directs the Court to Kouyate's reliance on Howard that a theory of universal benzene contamination "is, therefore, essentially an attack on the FDA's determination that OTC acne drugs containing BPO are 'generally recognized as safe and effective' and 'not misbranded' if they comply with the monograph." Id., quoting Howard, 2024 WL 4272931, at *7. However, as discussed above, this Court has found that by bringing such a claim is not in contradiction to the Acne Monograph, which also requires compliance with "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Thus, the Court finds Kouyate to be unpersuasive.

The last aspect discussed by the parties is that Walgreens voluntarily recalled some of its BPO products. Walgreens argues that simply because Walgreens voluntarily recalled some of its products that this should lead to an inference that all of its BPO products that entered commerce contained benzene. Plaintiffs did not directly address this. Though the Court agrees that the mere existence of a recall does not prove that any individual's [product] actually contained a nonconformity," Cascio v. Johnson & Johnson, No. 1:23-cv- 3127-TWT, 2024 WL 693489, *2 (N.D. Ga. Feb. 20, 2024), on a motion to dismiss, the Court does not require a plaintiff to plead *proof* and gives ever reasonable inference in favor of the non-moving party. Thus, the Court considers the voluntary recall for what it is worth.

At bottom, Walgreens' argument comes down to plausibility. "The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Soo Park v. Thompson, 851 F.3d 910, 928 (9th Cir. 2017), quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). Because many of the relevant facts here are known only to Walgreens, and in light of all the allegations in the operative complaint, the Court concludes that Plaintiffs have pleaded sufficient facts to state plausible claims pursuant to this theory. See id.

**3. Theory of Violation of cGMPs**

Walgreens argues that despite the Court's previous findings and recommendations, Plaintiffs "still allege no facts to support an inference that Walgreens violated any cGMPs." (ECF No. 84, p. 9.) Instead, Walgreens offers that what Plaintiffs have alleged is their "belie[f] that it was the manufacturing and holding of the Products at unacceptable temperatures that causes the benzene contamination and/or any instability in the Products." (Id., quoting ECF No 78, ¶ 113.) Walgreens characterizes Plaintiffs' underlying logic as requiring a circular inference Plaintiffs unsuccessfully made in their last complaint—namely, that the alleged benzene contamination in the Valisure study somehow "indicates that there was a critical failure in [Walgreens'] quality control and testing protocols as required by the [] cGMPs . . . ." (Id., quoting ECF No. 78, ¶ 118.)

In opposition, Plaintiffs have directed the Court to the following paragraphs in the operative complaint:

> 113. Whether during the manufacturing or holding process, the Products should not have become adulterated with elevated levels of benzene. The presence of benzene above 2 ppm—which, upon information and belief, resulted from Defendant's failure to comply with cGMPs—renders the Products both adulterated and misbranded under the FDCA. The mechanism by which BPO degrades into benzene is known (high temperatures). Had the manufacturing inputs, manufacturing, and holding process been conducted within acceptable temperatures, as required by the cGMP regulations cited above, it is unlikely that any benzene would be present in the Products. Thus, Plaintiffs believe that it was the manufacturing and holding of the Products at unacceptable temperatures that causes the benzene contamination and/or any instability in the Products. Defendant had no policies in place to ensure the BPO Products were held, transported, and stored at the correct temperatures. Defendant did not ensure that the BPO Products were held at the correct temperatures during transit from the BPO manufacturers to Defendant nor from Defendant to retailers. Additionally, had the benzene contamination been from improper inputs, failure to clean, maintain, and sanitize equipment, or failure to establish control manufacturing and holding procedures, it still would be a violation of the cGMP.
>
> 114. Accordingly, Defendant violated the cGMP by not manufacturing or holding the Products under proper conditions, with proper quality controls.
>
> 115. FDA guidance permits up to 2 ppm benzene in a pharmaceutical product if its use in the manufacturing process is "unavoidable." Benzene is not a necessity, or even intended, part of the Product's manufacturing process. Given the long history and widespread use of acne products without any benzene contamination, the use of benzene in the Products is not "unavoidable." But regardless, Defendant's Products contain levels of benzene well above 2 ppm. Therefore, Defendant's Products could not possibly meet the cGMP testing requirements, as they would not have been released if properly tested. As noted above, cGMP requires testing at all relevant phases of the production and holding process, and at release of the Products, to ensure the Products' safety, identity, strength, quality or purity. Accordingly, Defendant's violated the cGMP by establishing, maintaining, and conducting proper benzene testing throughout its manufacturing process.
>
> 116. Defendant also knew, or should have been aware, that the Products were adulterated with benzene or would become adulterated with benzene. Defendant must also do stability testing to understand the "shelf life" of the Products and to assign an expiration date. It is well known that certain chemical ingredients can degrade or change because of environmental and storage conditions such as light, moisture, temperature, and humidity, or

> because of the passage of time. The stability testing should cover all expected distributor and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and specific test methods." If any stability testing finds that a Product is not stable under expected storage or use conditions, degrades, or create toxic byproducts, the Product cannot be sold to the public. Here, stability testing found that Defendant's formulation of the Products is unable to ensure that the Products do not contain unacceptable levels of benzene through their normal shelf-life. This is an additional violation of the cGMP.

(ECF No. 78, ¶¶ 113-16.)

Walgreens essentially raises its previous arguments that Plaintiffs' allegations are not based on facts to support an inference and that their cGMP theory is circular. (ECF No. 84, p. 9.) Yet, the part of the Court's concern in its previous findings and recommendations was that Plaintiffs seemingly were using a shotgun approach to pleading that gave the Court pause regarding whether Walgreens was sufficiently given notice.

In light of the allegations above, as well as the operative complaint generally, the Court is satisfied that Plaintiffs have sufficiently identified cGMPs in a way that puts Walgreens on notice of how it allegedly violated such cGMPs. For example, quoted paragraphs above demonstrate that Plaintiffs have centered upon two principal types of cGMPs as being violated: cGMPs relating to the manufacturing of the BPO products and cGMPs relating to the holding process after manufacturing. In other words, this time Plaintiffs have identified a "how," the Court finds that the logic chain from the Valisure study to the necessary assumption that Walgreens must have violated cGMPs to not be a plausible inference. This is now even more persuasive to the Court given the incorporation of the 2-ppm limit in the USP.

Walgreens takes issue with that, in its view, the only input that supports the allegations that these cGMPs were violated all stem from the Valisure study—a study that did not test the actual products Plaintiffs purchased but later tested products from Walgreens' BPO product line. However, as discussed above, "[t]he Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Soo Park, 851 F.3d at 928.

Walgreens' offered precedent is distinguishable or not persuasive. In Ebrahimi v. Mentor Worldwide LLC, the Ninth Circuit, in a memorandum opinion, affirmed the district court's dismissal of the plaintiff's medical device claim. 804 Fed. Appx. 871 (9th Cir. 2020) (mem.). The plaintiff "essentially contend[ed] that the court [could] plausibly infer that [the defendant] must have violated at least one of the FDA's CGMPs by not catching her allegedly defective [breast] implants." Id. at 872. The Court observed that "mere allegations 'suggesting that [the plaintiff's] particular breast implant[s] w[ere] defective does not show that [the defendant] failed to comply with the FDA's Current Good Manufacturing Practices.'" Id., quoting Weber, 940 F.3d at 1114. As should be apparent, the Court has found that Plaintiffs here have not provided mere allegations suggesting Walgreens' BPO was defective and therefore Walgreens must have violated cGMPs. In particular, Ebrahimi seemingly involved only one plaintiff with one purportedly defective product. Meanwhile, Plaintiffs have alleged multiple instances of benzene detection in BPO products.

Walgreens also cites to Weber, but the Court notes that even Weber was decided on summary judgment, not a motion to dismiss. Weber, 940 F.3d at 1114. In any event, the only evidence offered on behalf of the plaintiff in Weber relating to a defective medical device was an expert opinion that "[the plaintiff's] right implant's gel bleed exceeding the amount specified by its product labeling constituted a 'departure from the manufacturer's specifications' and a 'defect.'" Id. at 1113. The Ninth Circuit observed that this "opinion that the implant was defective and malfunctioned is not evidence that [the defendant] deviated from the FDA's pre-market approved procedures. *Res ipsa loquitor* is not enough to survive MDA preemption." Id. The Court finds this reasoning in line with Ebrahimi, where evidence of one defect was not enough to establish a violation of cGMPs.

Based on the foregoing, the Court will recommend denying this aspect of Walgreens' motion to dismiss.

**E. Standing for Products Plaintiffs Did Not Purchase**

There is a split in authority among district courts in the Ninth Circuit whether a plaintiff has Article III standing to bring claims for products they did not personally purchase but that

were purchased by unnamed class members. See Cordes v. Boulder Brands USA, Inc., No. CV 18-6534 PSG (JCx), 2018 WL 6714323, at *5 (C.D. Cal. Oct. 17, 2018) (collecting cases). Some courts have dismissed claims regarding non-purchased products for lack of standing. See, e.g., Lorentzen v. Kroger Co., 532 F. Supp. 3d 901, 908 (C.D. Cal. 2021) (acknowledging split of authority, stating "substantial similarity analysis appears to be inconsistent with the basic concept of standing" and dismissing claims based on non-purchased products); Missaghi v. Apple, Inc., No. CV-13-02003-GAF (AJWx), 2013 WL 12203021, at *8 (C.D. Cal. May 31, 2013) ("Plaintiff could not, as a matter of fact, have suffered injury from a product he never purchased, nor even claims to have seen advertisements concerning."); Banks v. R.C. Bigelow, Inc., 536 F. Supp. 3d 640, 650 (C.D. Cal. 2021) (denying motion to dismiss for lack of standing where plaintiffs "identified the products which they challenge and plausibly allege that the products are substantially similar" and noting defendants may raise this issue at the class certification stage). Yet, some courts had described that the "'prevailing view" in the Ninth Circuit is that class action plaintiffs can bring claims for products they did not purchase 'as long as the products and alleged misrepresentations are substantially similar.'" Id., quoting In re 5-Hour ENERGY Mktg. & Sales Practices Litig., No. MDL 13-2438 PSG (PLAx), 2014 WL 5311272, at *7 (C.D. Cal. Sept. 4, 2014).

The Court is inclined to agree with courts that found that a plaintiff may sue only on behalf of products he or she actually purchased. See TransUnion LLC v. Ramirez, 594 U.S. 413 (2021). Back to basics, in order to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. at 423, citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." Id. at 431. "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only 'the rights of individuals.'" Id. at 423, quoting Marbury v. Madison, 1 Cranch 137, 170, 5 U.S. 137

(1803). Under Article III, "federal courts do not adjudicate hypothetical or abstract disputes." Id.

In light of these principles, the "substantial similarity" analysis appears to be inconsistent with the basic concept of standing. "The similarity of a product, by itself, says nothing about whether a party suffered an injury traceable to the allegedly wrongful conduct of another." Lorentzen, 532 F. Supp. 3d at 909. Moreover, a "substantial similarity" test into the principle of standing "overlooks this point and invites an analysis that is both difficult to apply and unrelated to its objective." Id. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" Lewis v. Casey, 518 U.S. 343, 357 (internal citations omitted).

Here, Plaintiffs bought only Walgreens Maximum Strength 10% BPO Acne Foaming Wash and Walgreens 10% BPO Acne Cleansing Bar, not the remaining products in Walgreens' BPO product line. (See ECF No. 78, ¶ 1.) Because there is no injury alleged to the named Plaintiffs as to the other suggested products, Plaintiffs lacks standing to assert these unrelated claims.

With all this said, the Court again acknowledges that other courts in this Circuit have taken divergent approaches. See Cordes, 2018 WL 6714323, at *5. Therefore, in the alternative, the Court will recommend that this issue be addressed at class certification.

The Court will recommend granting this portion of Walgreens' motion to dismiss. In the alternative, the Court will recommend that this issue be addressed as class certification.

**F. Standing for Injunctive Relief**

Walgreens essentially argues that Plaintiffs lack standing to pursue injunctive relief because "Plaintiffs make no allegation they might be harmed in the future from the BPO Products." (ECF No. 84, p. 12.) Plaintiffs respond that they have sufficiently alleged standing for injunctive relief, citing to Davidson. (ECF No. 89, p. 12.) The Court agrees with Plaintiffs.

As expounded upon in Davidson v. Kimberly-Clark Corp., a plaintiff must demonstrate

constitutional standing separately for each form of relief requested. 889 F.3d 956, 967 (9th Cir. 2018), citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc., 528 U.S. 167, 185 (2000). For injunctive relief, which is a prospective remedy, the threat of injury must be "actual and imminent, not conjectural or hypothetical." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). In other words, the "threatened injury must be certainly impending to constitute injury in fact" and "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotation marks and alteration omitted). Past wrongs, though insufficient by themselves to grant standing, are "evidence bearing on whether there is a real and immediate threat of repeated injury." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). Where standing is premised entirely on the threat of repeated injury, a plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way." Id. at 111. In determining whether an injury is similar, courts "must be careful not to employ too narrow or technical an approach. Rather, [courts] must examine the questions realistically: [courts] must reject the temptation to parse too finely, and consider instead the context of the inquiry." Armstrong v. Davis, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other grounds by* Johnson v. California, 543 U.S. 499 (2005).

In resolving a split among district courts, the Davidson Court held "that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." 889 F.3d at 969, quoting Summers, 555 U.S. at 493. Importantly, "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." Id. at 969-70. "In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." Id. at 970. "In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the

product was improved." Id.

Plaintiffs have alleged that they both relied upon Walgreens' representations and warranties when purchasing their BPO products and had they known the products were not "properly manufactured, free from defects, safe for their intended use, not adulterated and misbranded, and legal to sell," they would not have purchased the products or paid less for the products. (ECF No. 78, ¶ 16, 18, 78, 101, 152.) Further, Plaintiffs have alleged that that there are "[f]easible alternative formulations, designs and materials, such as including antioxidants, [that] were available to Defendant at the time the Product was formulated, designed, and manufactured, to prevent and/or inhibit the formation of benzene in the Products." (Id. at ¶ 13.) This is coupled with Plaintiffs' allegations that "Defendant continues to omit the presence and/or risk of degradation of BPO to form benzene from its representations and labeling concerning the Products. Prospective injunctive relief is necessary to cure Defendant's conduct." (Id. at ¶ 248.) This seems to comport with the Ninth Circuit's first example in Davidson noted above.

Walgreens' attempts to distinguish Davidson, arguing that "it is implausible that Plaintiffs, operating under this (mistaken) belief, would ever purchase the BPO Products again, foreclosing any risk of future harm." (ECF No. 84, p. 13.) However, this logic was squarely addressed and rejected in Davidson. "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." 889 F.3d at 969-70.

Once more, Plaintiffs have alleged that BPO degrades into benzene (either as a direct result of violation of cGMPs or otherwise). Plaintiffs allege that other formulations are available that could curb the degradation, Walgreens continues to sell its BPO products without warning, and therefore, injunctive relief is necessary. Assuming Plaintiffs allegations are true, Plaintiffs would have no way to know whether in the future Walgreens' BPO products contained benzene (outside of independently testing every bottle they purchase).

For the foregoing reasons, the Court will recommend denying this aspect of Walgreens' motion to dismiss.

**G. Equitable Relief**

Walgreens argues that Plaintiffs have not shown and cannot show that an adequate legal

remedy is unavailable. (ECF No. 84, p. 15.) Thus, Walgreens argues that Plaintiffs are precluded from obtaining any equitable relief. (Id.) Plaintiffs respond that they have pleaded their equitable claims in the alternative, and thus, it would be premature to dismiss the claims. (ECF No. 89, p. 13.) At the pleadings stage, the Court agrees with Plaintiffs.

The parties have provided a slew of cases where district courts either dismissed equitable relief claims at a motion to dismiss where legal claims were available or did not. Compare Duttweiler v. Triumph Motorcycles (America) Ltd., No. 14-cv-04809-HSG, 2015 WL 4941780, at*8-*9 (N.D. Cal. Aug. 19, 2015) (finding that where a legal remedy exists, a plaintiff may not plead equitable relief in the alternative) with Jeong v. Nexo Financial LLC, No. 21-cv-02392-BLF, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (noting no controlling authority regarding pleadings in the alternatives regarding legal and equitable relief and holding that a plaintiff may proceed past a motion to dismiss with alternative theories). This Court finds the view of allowing equitable pleading in the alternative to proceed to be better supported by precedent and the Federal Rules of Civil Procedure. Rules 8(d)(2), (3) provide:

> ***Alternative Statements of a Claim or Defense.*** A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
>
> ***Inconsistent Claims or Defenses***. A party may state as many separate claims or defenses as it has, regardless of consistency.

Moreover, Rule 8(e) provides:

> ***Construing Pleadings.*** Pleadings must be construed so as to do justice.

Thus, pleadings in the alternative are contemplated the Federal Rules of Civil Procedure and may even be inconsistent. And since the Court is tasked with construing complaints so as to do justice, the Court agrees with Plaintiffs that it would be premature at this juncture to dismiss the equitable claims here. To be sure, it will almost certainly become evident at a later stage whether actual legal damages are in play thereby necessarily clarifying which claims and relief would be viable.

Therefore, the Court will recommend denying this aspect of Walgreens' motion to

dismiss.

/ / /

## VI.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendant Walgreens' motion to dismiss (ECF No. 84) be GRANTED IN PART and DENIED IN PART as follows:

1. The motion to dismiss as to that Plaintiffs have standing to sue only on behalf of products they actually purchased be GRANTED;
    a. In the alternative, the issue of whether Plaintiffs may represent class members who did not purchase the BPO products Plaintiffs purchased be resolved at class certification; and
2. The motion to dismiss be otherwise DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. **Within fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Absent leave of the Court, any objections shall not exceed **twenty (20) pages** and, absent good cause and leave of the Court, shall be limited to arguments previously presented by the parties or ruled upon by the Court, and shall not cite any new authority which could have been cited at the time of the filing.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **August 13, 2026**

STANLEY A. BOONE
United States Magistrate Judge